# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| Robert Hanson, on behalf of himself and all others similarly situated, <br><br> Plaintiff, <br> v. <br><br> Sanford Health Corp., <br><br> Defendant. | ) ) ) ) ) ) ) ) ) ) ) <br> **CLASS ACTION COMPLAINT** |

Plaintiff Robert Hanson, individually and on behalf of himself and all others similar situated, hereby files this class action complaint against Defendant Sanford Health Corporation and in support thereof alleges the following.

## INTRODUCTION

1.      This is a case about a healthcare provider's decision to repeatedly infringe on the privacy of its patients and prospective patients by deploying covert third-party tracking technology ("Tracking Tools") on its website, https://sanfordhealth.com, intercepting private information, and disclosing that information to third parties such as Meta, Snapchat, Google, Microsoft, and others.  In doing so, Sanford engaged in the unauthorized disclosure of its patients' highly sensitive Personal Health Information ("PHI") and Personally Identifiable Information ("PII") (collectively "Personal Information") to third parties, in violation of Minnesota and federal law.

2.      Sanford Health is "the largest rural health system in the United States," serving more than 1.4 million patients across fifteen states, primarily South Dakota, North

Dakota, Minnesota, Wyoming, Iowa, Wisconsin, and Michigan.[1] According to Sanford's website, its health system is comprised of "56 hospitals, more than 270 clinic locations, 144 senior care communities, 4,500 physicians and advanced practice providers, nearly 1,000 active clinical trials and studies, and nine world clinic locations around the globe."[2] This include 133 locations in the state of Minnesota.

3.      Sanford Health maintains a website at https://www/sanfordhealth.org. On the Sanford website, patients and prospective patients can, among other things, search for doctors, research Sanford locations, learn about the medical services Sanford provides, and find access to care. Unbeknownst to its patients and prospective patients, these communications with the Sanford website are intercepted and disclosed to third parties through Sanford's use of the Tracking Tools.

4.      One of the Tracking Tools Sanford deployed on its website is the Meta Pixel ("Pixel").[3] Pixel is a snippet of code that, when embedded on a website, tracks the website visitor's activity on that website and sends that data to Meta. This includes tracking and logging pages and subpages the website user visits during a website session that reveal patient status and other Personal Information, which is not anonymized. Indeed, Pixel is routinely used to target specific individuals by utilizing the data gathered through Pixel to

---

[1] https://www.sanfordhealth.org/about; https://news.sanfordhealth.org/news-release/sanford-and-marshfield-clinic-health-system-complete-merger/#:~:text=About%20Sanford%20Health,org%20or%20Sanford%20Health%20News (last visited on July 28, 2025).

[2] *Id.*

[3] Meta also provides other tracking technologies that give the same or similar tracking functionalities as Pixel, including, but not limited to, Conversions API, SDKs, and Audiences.

build profiles for the purpose of future targeting and marketing. Here, the information transmitted to third-party Meta without Plaintiff's consent included private health information,[4] which is some of the most personal and sensitive data a person has.

5.      Additionally, when a patient communicates with Sanford's Website where Pixel is present, Pixel source code causes the exact content of the patients' communications with the Website to be re-directed to Meta in a way that identifies the person  and tracks the person's patient status. Here, for example, Plaintiff used the Website to communicate regarding his specific physician. Unbeknownst to Plaintiff, when he communicated about his personal health information, Pixel secretly intercepted, recorded, and transmitted those private communications to Meta along with unique identifiers Meta could use to identify Plaintiff.  Specifically, Sanford used Pixel to intercept its users' communications and have those communications associated with Facebook and Instagram user profiles for purposes of future ad targeting and marketing.

6.      As a result of Defendant's use of Pixel, Plaintiff's and Class Members' Personal Information, including, but not limited to, computer IP addresses; patient status; health conditions; health symptoms; treatments; health assessments; and unique identifiers

---

[4] Under HIPAA, "health information" is defined as "any information[], whether oral or recorded in any form or medium, that . . . [i]s created or received by a health care provider . . . and [r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Additionally, HIPAA defines "health care" as "care, services, or supplies related to the health of an individual" and includes, but is not limited to, the "[s]ale or dispensing of drug, device, equipment, or other item in accordance with a prescription." *Id.*

used to link the web communications to Plaintiff and the Class, was compromised and disclosed to third parties without authorization or consent.

7. Such private information would allow Meta to know that a specific patient was seeking confidential health care from Sanford or exploring treatment for a specific condition.

8. Defendant's Tracking Tools have also transmitted patients' Sensitive Information to additional unauthorized third parties for marketing and advertising purposes, including Snapchat and Google, among others.

9. Sanford also employed snippets of JavaScript computer code ("Session Replay Code") on its Website. Session Replay Code is a tool sold by vendors like Microsoft and Mixpixel that permits the third-party vendors and website owners to record a website visitor's interactions with the website. It operates like digital surveillance, recording the website visitor's electronic communications with the Sanford website, including their mouse movements, finger swipes (for those interacting with the website through a touchscreen), clicks, keystrokes (such as text being entered into an information field or text box), URLs of web pages visited, and/or other electronic communications ("Website Communications") in real-time. Sanford utilizes the Microsoft and Mixpanel Session Replay Codes on its website.

10. Plaintiff and the Class Members never consented to, authorized, or otherwise agreed to allow Defendant to disclose their Personal Information to anyone other than those reasonably believed to be part of Sanford, acting in some healthcare-related capacity. Despite this, Defendant knowingly and intentionally disclosed Plaintiff's and the Class

4

Members' Personal Information to multiple third-party technology companies to monetize Plaintiff's and the putative Class Members' data.

11. As a direct and proximate result of Defendant's unauthorized exposure of Plaintiff's and the Class Members' Sensitive Information, Plaintiff and the Class Members have suffered injury, including an invasion of privacy; loss of the benefit of the bargain Plaintiff and the Class Members considered at the time they bargained for healthcare services and agreed to use Defendant's Website for services; statutory damages; and the continued and ongoing risk to their Private Information.

12. Accordingly, Plaintiff brings this action individually, and on behalf of Classes of similarly situated individuals, to recover for harms suffered and asserts the following claims: (i) invasion of privacy, (ii) violations of the Electronic Communications Privacy Act ("ECPA"), (iii) violations of the Minnesota Unfair and Deceptive Trade Practices Act ("MUDTPA"), (iv) violations of the Minnesota Health Records Act, (v) violations of the Minnesota Consumer Fraud Act, and (vi) unjust enrichment.

**PARTIES**

13. Plaintiff Robert Hanson is a natural person domiciled in the State of Minnesota. His address is located in Park Rapids, Minnesota.

14. Plaintiff is a current patient of Defendant.

15. In the fall of 2024, Plaintiff was due to receive back surgery. In advance of his surgery, Plaintiff went to the "Doctors" page on the Sanford Health website, where he

input his physician's information.[5] On information and belief, Sanford Health utilizes Tracking Tools within the "Doctors" page.

16. Without being able to recall a specific advertisement, Plaintiff recalls receiving targeted advertisements relating to back and spine issues after his interaction with the Defendant's website.

17. Plaintiff reasonably expected his online communications with Sanford Health, which identify his physician, would not be shared without third parties without his knowledge, consent, or authorization. Without Plaintiff's knowledge, consent, or authorization, Defendant exposed and intentionally allowed third parties to intercept Plaintiff's personal, private, and confidential data through the Tracking Tools.

18. Sanford Health Corporation is a South Dakota nonprofit corporation with its principal place of business in Sioux Falls, South Dakota.

## JURISDICTION AND VENUE

19. At all relevant times, Defendant knew that its practices would directly result in the collection of information in Minnesota and Defendant collected and monetized data from its patients that reside in Minnesota and receive care from Sanford's Minnesota locations. Sanford maintains 133 locations in Minnesota and website users can book appointments at Sanford's Minnesota locations through the Defendant's website, patient portal, and app.[6]

---

[5] https://www.sanfordhealth.org/doctors (last visited July 18, 2025).
[6] Sanford Health,
https://www.sanfordhealth.org/locations#first=12&f:@flocationstate46747=[Minnesota]
&srt=%40ftitle46747%20ascending (last visited June 25, 2025)

20.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2)(A) because this case is a class action where the aggregate claims of all members of the proposed class are in excess of $5,000,000.00, exclusive of interest and costs, there are 100 or more members of the proposed class, and at least one member of the proposed class, including Plaintiff, are citizens of a state different than Defendants.

21.     This Court has personal jurisdiction over Defendants because a substantial part of the events and conduct giving rise to Plaintiff's claims occurred in the state of Minnesota. The privacy violations complained of herein resulted from Defendants' purposeful and tortious acts directed towards citizens in Minnesota.

22.     Pursuant to 28 U.S.C. § 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

## FACTUAL ALLEGATIONS

**A.     Federal Regulators Have Warned Healthcare Providers About the Use of Tracking Technologies**

23.     The surreptitious collection and disclosure of Sensitive Information is an extremely serious data security and privacy issue. Both the Federal Trade Commission ("FTC") and the Office for Civil Rights of the U.S. Department of Health and Human Services ("HHS") have re-pronounced the necessity for data security and privacy concerning health information and health care providers' obligations health information exchanged online.

24.   For instance, the FTC published a bulletin entitled *Protecting the privacy of health information: A baker's dozen takeaways from FTC cases*, in which it noted that "[h]ealth information is not just about medications, procedures, and diagnoses. Rather, it is anything that conveys information—or enables an inference—about a consumer's health. Indeed, [recent FTC enforcement actions involving] Premom, BetterHelp, GoodRx and Flo Health make clear that the fact that a consumer is using a particular health-related app or website—one related to mental health or fertility, for example—or how they interact with that app (say, turning 'pregnancy mode' on or off) may itself be health information."[7]

25.   The FTC is unequivocal in its stance as it informs—in no uncertain terms—companies that provide healthcare services that they should not use tracking technologies to collect sensitive health information and disclose it to various platforms without informed consent:

> **Don't use behind-the-scenes tracking technologies that contradict your privacy promises or otherwise harm consumers.** In today's surveillance economy, the consumer is often the product. Consumer data powers the advertising machine that goes right back to the consumer. But when companies use consumers' sensitive health data for marketing and advertising purposes, such as by sending that data to marketing firms via tracking pixels on websites or software development kits on apps, watch out. [Recent FTC enforcement actions such as] *BetterHelp*, *GoodRx*, *Premom*, and *Flo* make clear that practices like that may run afoul of the FTC Act if they violate privacy promises or if the company

---

[7] *See* Elisa Jillison, *Protecting the privacy of health information: A Baker's dozen takeaways from FTC cases,* the FTC Business Blog (July 25, 2023), https://www.ftc.gov/business-guidance/blog/2023/07/protecting-privacy-health-information-bakers-dozen-takeaways-ftc-cases (last visited May 14, 2024).

8

fails to get consumers' affirmative express consent for the disclosure of sensitive health information.[8]

26.     In December 2022, HHS similarly warned healthcare providers that, "Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules."[9]  The OCR's guidance also made clear that, "disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures."[10]

27.     In July 2023, the FTC and HHS sent a letter to approximately 130 healthcare providers warning them about the use of online tracking technologies that could result in unauthorized disclosures of Sensitive Information to third parties.[11]  The letter highlighted the "risks and concerns about the use of technologies, such as the Meta/Facebook pixel and Google Analytics, that can track a user's online activities," and warned about "[i]mpermissible disclosures of an individual's personal health information to third parties" that could "result in a wide range of harms to an individual or others."[12]  According to the

---

[8] *Id.* (emphasis added).

[9] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, (March 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html. The original guidance was issued in December 2022 and was recently updated in March 2024.

[10] *Id.*

[11] See Leslie Fair, *FTC-HHS joint letter gets to the heart of the risks tracking technologies pose to personal health information*, FTC Business Blog (July 20, 2023) https://www.ftc.gov/business-guidance/blog/2023/07/ftc-hhs-joint-letter-gets-heart-risks-tracking-technologies-pose-personal-health-information (last visited May 14, 2024).

[12] https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf

letter, "[s]uch disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more."[13]

28.    Despite these clear warnings from federal regulators and prior enforcement actions, Sanford embedded Tracking Tools on its Website to secretly track its patients' communications regarding healthcare information and disclose those communications to third parties.

**B.    Sanford's Website Disclosures**

29.    At the bottom of the Sanford webpage, in small font, Website users can find Sanford's "Terms and Conditions" for the use of its website. Within its Terms and Conditions, Sanford avers, "THIS SITE DOES NOT CONSTITUTE AN ATTEMPT TO PRACTICE MEDICINE NOR DOES IT ESTABLISH A DOCTOR-PATIENT OR HOSPITAL PATIENT RELATIONSHIP."[14]

30.    Sanford also acknowledges that individuals communicate with Sanford through the Sanford website, stating "By communicating with Sanford, however, you grant Sanford permission to use any information, suggestions, ideas, drawings or concepts that you communicate without any compensation to you whatsoever."[15]

31.    Sanford also maintains a Privacy Statement, which website users may again find only if they scroll to the bottom of Sanford's website. In its Privacy Statement,

---

[13] *Id.*
[14] https://www.sanfordhealth.org/terms-and-conditions (last visited on July 28, 2025).
[15] *Id.*

"Sanford Health acknowledges and respects any individual's right to privacy. We take your concerns related to privacy and security seriously. We therefore want you to know how we may collect, use, share, and protect your information through our website and mobile apps."[16]

32.   Sanford further represents that

> Visitors can browse all Sanford Health websites without providing any personal information. Certain pages contain forms that give visitors the option of providing us with contact information including name, physical address, phone, and email address if you choose to contact us. Providing this information is voluntary. The information you submit is shared internally with Sanford Health employees who need this information to help respond to your request or improve Sanford Health operations. Information submitted may also be used to evaluate the technical functionality of our website. Information provided may also be utilized to address inappropriate use or communications associated with our website.[17]

33.   Sanford does not notify its patients that their use of the website constitutes the communication of PHI.

34.   Sanford's Privacy Statement also addresses it use of Tracking Technology: including "cookies," "web beacons," and "third Party Tracking Technologies." Sanford states:

> Sanford Health, or any third-party advertising partners we choose to work with, may employ various tracking technologies such as cookies, web beacons and analytics software. These tools help us manage the content on our websites by informing us what content is useful to visitors. Cookies

---

[16] https://www.sanfordhealth.org/privacy-statement (last visited on July 28, 2025).
[17] *Id.*

- When you visit our website we send one or more "cookies" to your computer or other internet browsing device. Cookies are alphanumeric identifiers stored on your computer through your web browser and are used by most websites to help personalize your browsing experience. Cookies may facilitate additional website features for enhanced performance of your web experience such as remembering preferences, allowing social interactions, analyzing usage for website optimization, providing custom content, allowing third parties to provide social sharing tools, and delivering images or videos from third party websites. Some features of our website will not function if you do not allow cookies. We may link the information we store in cookies with any other information you submit while on our website.
- We may use both session ID cookies and persistent cookies. A session ID cookie expires when you close your internet browser. A persistent cookie is stored on your computer. Cookies enable us to track and target the interest of our visitors to enhance your experience on our website. You can learn how to remove persistent cookies by following the directions provided in the "Help" portion of your internet browser.

Web Beacons

- We may use Web Beacons alone or with cookies to collect information about our website content. Web Beacons are tiny graphic objects that are embedded in a web page or email and are usually invisible to the user but allows verification that a user has viewed the web page or email. Web Beacons may be used to track web page visits or form submissions. In some cases the Web Beacon may be tied to the information submitted by visitors to our website. This technology allows us to evaluate the effectiveness of our website and any Sanford Health advertising or marketing campaigns. [18]

35. Despite its acknowledgement of their use of third-party tracking technologies, Sanford nonetheless attempts to abdicate any responsibility of the use of the

---

[18] *Id.*

trackers, stating: "The use of cookies or web beacons by any third-party service provider is not covered by our Privacy Statement. We do not have access to or control over these technologies utilized by third parties."[19]

36.     Sanford's Privacy Statement says:

> We do not share personal information with third parties unrelated to Sanford Health, except when required to for legal purposes or investigations. We may share your personal information with third parties who we have contracted with to help us provide services. We will ensure that these third parties have agreed not to use or disclose your personal information except to help us provide the services.[20]

37.     Sanford does not, on its website, inform its patients that the actions they take on the website constitute the communication of Protected Health Information.

## C.     The Meta Pixel

38.     Through its Website, Sanford connects Plaintiff and the Class Members to Defendant's digital health care platform with a core goal of increasing profitability.

39.     In furtherance of that goal, and to increase the success of its advertising and marketing, Defendant purposely embedded and deployed Meta Pixel on its Website. By doing so, Defendant surreptitiously shared its patients' and prospective patients' identities and online activity, including private communications related to conditions, symptoms, treatments, patient status, and medications, with Meta.

40.     Meta's core business function is to sell advertising, and it does so on several platforms, including Facebook and Instagram. The bulk of Meta's billions of dollars in

---

[19] *Id.*
[20] *Id.*

annual revenue comes from advertising—a practice in which Meta actively participates by using algorithms that approve and deny ads based on the ads' content, human moderators that further review ads for both legality and aesthetics prior to and after the ads are published, and other algorithms that connect ads to specific users, without the assistance or input of the advertiser.

41.     Over the last decade, Facebook, now Meta, has become one of the largest and fastest growing online advertisers in the world. Since its creation in 2004, Facebook's daily, monthly, and annual user base has grown exponentially to billions of users.

42.     Meta's advertising business has been successful due, in significant part, to Meta's ability to target users, both based on information users provide to Meta, and based on other information about users Meta extracts from the Internet at large. Given the highly specific data used to target particular users, thousands of companies and individuals utilize Facebook's advertising services.

43.     One of Meta's most powerful advertising tools is the "Meta Pixel" (formerly the "Facebook Pixel"), which it first launched in 2015.

44.     Meta branded Pixel as "a new way to report and optimize for conversions, build audiences and get rich insights about how people use your website." Meta further stated:

> Facebook pixel, [is] a new way to report and optimize for conversions, build audiences[,] and get rich insights about how people use your website. We're also announcing the availability of custom conversions, a new rule-based method to track and report conversions for your Facebook ads.
> Facebook pixel makes things simple for advertisers by combining the functionality of the Conversion Tracking pixels

14

and Custom Audience pixels into a single pixel. You only need to place a single pixel across your entire website to report and optimize for conversions. Since it is built on top of the upgraded Custom Audience pixel, all the features announced in our previous blog post (Announcing Upgrades to Conversion Tracking and Optimization at Facebook) are supported through Facebook pixel as well.

[Advertisers and website operators] can use Facebook pixel to track and optimize for conversions by adding standard events (*e.g.*, Purchase) to your Facebook pixel base code on appropriate pages (*e.g.*, purchase confirmation page).[21]

45.    Pixel is an easily attainable piece of code that Meta makes available to website developers for free. In exchange, at a minimum, website developers must agree to Meta's Business Tool Terms.[22]

46.    The Business Tool Terms note that the Meta's Business Tools, including Pixel, will capture two types of information: "Contact Information" which "personally identifies individuals," and "Event Data" which contains additional information about people and their use of a developer's website.[23]

47.    The Business Tools Terms also require websites to "provide[] robust and sufficiently prominent notice to users . . . on each web page where our pixels are used that links to a clear explanation (a) that third parties, including Meta, may . . . collect or receive

---

[21]    Cecile Ho, *Announcing Facebook Pixel*, Meta (Oct. 14, 2015), https://developers.facebook.com/ads/blog/post/v2/2015/10/14/announcing-facebook-pixel/ (last visited May 14, 2024).

[22] Meta Business Tool Terms, https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr ("When you use any of the Meta Business Tools . . . or otherwise enable the collection of Business Tool Data . . . these Business Tool Terms govern the use of that data.") (last visited May 14, 2024).

[23] *Id.* at Section 1(a)(i)-(ii)

information from your websites and elsewhere on the Internet and use that information to . . . deliver ads, (b) how users can opt out of the collection and use of information . . . and (c) where a user can access a mechanism for exercising such choice[.]"[24]

48.     However, even with all of these protocols in place, Meta prohibits the disclosure of Business Tool Data "that you know or reasonably should know . . . includes health, financial information or other categories of sensitive information (including any information defined as sensitive under applicable laws, regulations and applicable industry guidelines)."[25]

49.     After agreeing to the Business Tools Terms, website developers can choose to install and use Pixel on their websites to track and measure certain actions, such as a website visitor's text searches and page views, including the detailed URLs triggered by page views. When a website visitor takes an action a developer chooses to track on its website, Pixel is triggered and sends data about that "Event" to Meta. All of this happens without the user's knowledge or consent.

50.     Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet. Each "client device" (such as a computer, tablet, or smart phone) accesses web content through a web browser (*e.g.*, Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

---

[24] *Id.* at Section 3(c)(i)
[25] *Id.* at Section 1(h).

51.     Every website is hosted by a computer "server" that holds the website's contents and through which the entity in charge of the website exchanges communications with Internet users' client devices via their web browsers.

52.     Ultimately, a browsing session online may consist of thousands of web communications. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies:

- An HTTP Request is an electronic communication a website visitor sends from his device's browser to the website's server. There are two types of HTTP Requests: (1) GET Requests, which are one of the most common types of HTTP Requests—in addition to specifying a particular URL (*i.e.*, web address), GET Requests can also send data to the host server embedded inside the URL, and can include cookies; and (2) POST Requests which can send a large amount of data outside of the URL. In this case, a patient's HTTP Request would be asking Defendant's Website to get certain information, such as a list of clinic locations or prescriptions. So that servers can better understand what information users are requesting, HTTP Requests also use URLs that contain parameters, which use variables and assigned values in the URL to pass additional information through the HTTP Request.

- Cookies are a text file that website operators and others use to store information on the website visitor's device; these can later be

17

communicated to a server or servers. Cookies are sent with HTTP Requests from website visitor's devices to the host server. Some cookies are "third-party cookies," which means they can store and communicate data when visiting one website to an entirely different website. Third-party cookies are created by a website with a domain name other than the one the user is visiting, in this case Meta. There are also "first-party cookies," like the fbp cookie, which is created by the website the user is visiting, in this case Defendant. Meta uses both first- and third-party cookies in Pixel to link Facebook IDs and Facebook profiles, and Defendant sends these identifiers to Meta.

- An HTTP Response is a response to an HTTP Request. It is an electronic communication that is sent as a reply to the website visitor's device's web browser from the host server. HTTP responses may consist of a web page, another kind of file, text information, or error codes, among other data. Basically, the HTTP Response is when the website sends the requested information (*see* the HTTP Request); this is sometimes called the "Markup."

53.    A user's HTTP Request essentially asks the Defendant's Website to retrieve certain information (such as "Orthopedics"). The HTTP Response then renders or loads the requested information in the form of Markup (i.e., the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate Defendant's Website).

54.     Every website, including Defendant's, is composed of Markup and "Source code." Source code is a set of instructions that commands the website visitor's browser to take certain actions when the web page loads or when a specified event triggers the code.

55.     Source code may also command a web browser to transmit data to third parties in the form of an HTTP Request. Such data transmissions allow a website to export data about users and their actions to third parties. Third parties receiving this data are typically configured to track user data and communications for marketing purposes.

56.     Transmission of data can be done quietly in the background without notifying the web browser's user. The pixels are invisible to website users and thus, without any knowledge, authorization, or action by the user, the website site developer (or website commander) can use its source code to contemporaneously and to invisibly re-direct the user's PII and other non-public medical information to third parties. Through Pixel, Defendant uses source code that can accomplish just that.

57.     Pixel "tracks the people and the types of actions they take."[26] According to Meta, Pixel is a piece of code that allows Defendant to measure the effectiveness of [its] advertising by understanding the actions [website visitors] take on [its] website."[27] Thus, by secretly recording and transmitting data to Meta—without the user's knowledge or consent—Pixel acts much like a traditional wiretap controlled by Sanford.

---

[26] *Retargeting*, Facebook, https://www.facebook.com/business/goals/retargeting (last visited May 14, 2024).
[27] *About Meta Pixel*, Meta Business Help Center, https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited May 14, 2024).

58.     Through this online tracking technology, Meta intercepts each page a user visits, what buttons they click, as well as the specific information the user inputs into the website and other searches conducted. Pixel sends each of these pieces of information to Meta with PII, such as the user's IP address. Meta stores this data on its own servers, in some instances for years on end, and independently uses the data for its own financial gain.

59.     Importantly, this data is often associated with the individual user's Facebook account. For example, if the user is logged into their Facebook account when the user visits Defendant's website, Meta receives third-party cookies allowing Meta to link the data collected by Pixel to the specific Facebook user. In other words, a user's personal and private information sent by the Meta Pixel to Facebook is sent alongside that user's personal identifiers, including IP address and cookie values, which can be linked to the user's unique Facebook account.

60.     Meta accomplishes this by placing cookies in the web browsers of users logged into their services, which aids Meta in identifying users.

61.     One such example is the "c_user" cookie, which is a type of third-party cookie assigned to each person who has a Facebook account. The "c_user" cookie contains a numerical value known as the Facebook ID ("FID") that uniquely identifies a Facebook user. It is composed of a unique and persistent set of numbers. A user's FID is linked to their Facebook profile, which generally contains a wide range of demographic and other information about the user, including pictures, personal interests, work history, relationship status, and other details. Because the user's Facebook Profile ID uniquely identifies an individual's Facebook account, Meta—or any ordinary person—can easily use the

Facebook Profile ID to quickly, and easily, locate, access, and view the user's corresponding Facebook profile. Thus, when a Facebook user visits Defendant's Website while logged in to their Facebook account, Pixel transmits the user's private web communications with the Defendant along with the "c_user" cookie. Meta can then use this information to match the web communications with the user's Facebook ID.

62.    Even if a user does not have a Facebook account or is not logged in to Facebook when browsing the Defendant's Website, Pixel transmits the user's web communications with Defendant's Website to Meta along with a unique identifier associated with another cookie called the "_fbp" cookie. Meta can then use that unique identifier to link the user's web communications with the user's Facebook ID. And if a user who does not have a Facebook account later creates an account, Meta may be able to associate the user's historical browsing history intercepted via Pixel and "_fbp" cookie to the newly created account.

63.    Meta's Business Tools Terms make clear that Pixel is meant to "match the Contact Information" of users "against user IDs . . . as well as to combine those user IDs with corresponding Event Data."[28]

64.    After Meta is finished processing users' intercepted information, it makes the relevant analytics available to Sanford through Meta's Event Manager tool.

---

[28] Meta Business Tool Terms, Section 2(a)(i)(1), https://www.facebook.com/legal/businesstech?paipv=0&eav=AfaHqYwiwGYZ0X0vZZ1I5uQ1zuI0STn-VURAyVhvlzw1Df5nxIgiuXOqcd5A8yKuEtk&_rdr (last visited May 14, 2024).

65.     Using the Events Manager, Sanford can and is intended to review a summary of users' activity, including the pages, parameters and URLs sent through Pixel,[29] as well as any included metadata.[30]

66.     Thus, without any knowledge, authorization, or action by a user, a website owner like Defendant can use its Source Code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to Meta.  Meta then uses the information transmitted by Pixel to match the user with their Facebook ID.

67.     Judge William H. Orrick on the U.S. District Court for the Northern District of California summarized how this process plays out:

> To understand how the Meta Pixel typically works, imagine the following scenario. A shoe company wishes to gather certain information on customers and potential customers who visit its website. The shoe company first agrees to Meta's Business Tools Terms (discussed below), which govern the use of data from the Pixel. The shoe company then customizes the Meta Pixel to track, say, every time a site visitor clicks on the "sale" button on its website, which is called an "Event." Every time a user accesses the website and clicks on the "sale" button (i.e., an "Event" occurs), it triggers the Meta Pixel, which then sends certain data to Meta. Meta will attempt to match the customer data that it receives to Meta users—Meta cannot match non-

---

[29] *How to view pages, parameters and URLs in Meta Events Manager*, https://www.facebook.com/business/help/815029860145251 ("In Meta Events Manager, you can see a summary of pages, parameters and URLs recently sent through the Meta Pixel . . . .") (last visited May 14, 2024).

[30] A web developer using the Events Manager can "[c]lick on the filter icon to select what activity types and details are display." Developers can sort by activity types, including "automatically logged pixel events," which may contain metadata. *Test your app or web browser events using the test events tool*, https://www.facebook.com/business/help/2040882565969969?id=1205376682832142 (last visited May 14, 2024).

Meta users. The shoe company may then choose to create "Custom Audiences" (i.e., all of the customers and potential customers who clicked on the "sale" button) who will receive targeted ads on Facebook, Instagram, and publishers within Meta's Audience Network. Meta may also provide the shoe company with de-identified, aggregated information so the shoe company understands the impact of its ads by measuring what happens when people see them. Meta does not reveal the identity of the matched Meta users to the shoe company.

*In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO, 2022 WL 17869218, at *2 (N.D. Cal. Dec. 22, 2022) (internal citations omitted).[31]

68.    Pixel also allows a company, like Defendant, to impact the delivery of ads, measure cross-device conversions, create custom audiences, and save money on advertising and marketing costs.[32] But, most relevant here, Pixel allowed Defendant and Meta to track website users secretly on Defendant's Website and intercept their communications with Defendant.

69.    When visitors to Sanford's Website, like Plaintiff and the putative Class Members, communicated with Defendant or inquired about personal health-related topics, that information was transmitted to and intercepted by Meta.

70.    The Sensitive Information intercepted, recorded, and transmitted to Meta includes, but is not limited to, patient status; health symptoms; health conditions;

---

[31] In describing Pixel technology in *In re Meta Pixel Healthcare Litig.*, the court referenced the declaration of expert Richard M. Smith, which provides further details on the manner in which the challenged Pixel technology works and Meta's arrangements with health providers that employ it. 2022 WL 17869218, at *2. *See* Declaration of Richard M. Smith, filed in *In re Meta Pixel Healthcare Litig.*, No. 22-CV-03580-WHO (N.D. Cal.) [ECF 49].
[32]*Meta Pixel,* Facebook, https://www.facebook.com/business/tools/meta-pixel?ref=search_new_2 (last visited May 14, 2024).

treatments; and medications.   During that same transmission, Defendant would also provide Meta with the patient's Facebook ID number, other persistent cookies, device ID, computer IP addresses, or other PII. This information makes it easy to link private communications with Defendant via the Website to a specific and identifiable Facebook user.

71.    Once Meta has that data, it can process it, analyze it, and assimilate it into databases like Core Audiences or Custom Audiences for advertising purposes. If the website visitor is also a Facebook user, Meta will associate the information that it collects from the visitor with a Facebook ID that identifies the user's name and Facebook profile. In sum, Pixel allows Meta to learn, manipulate, and use for financial gain, the medical and private content Defendant's Website visitors communicated, viewed, or otherwise interacted with on Defendant's Website.

**D.    Other Tracking Pixels and Codes**

72.   In addition to its deployment of the Meta Pixel, Sanford deploys Tracking Tools from at least ten other third-party technology companies, including but not limited to Snapchat, and Google.  These Tracking Tools function in a substantially similar way as the Meta Pixel by intercepting the substance of a user's communications with the Sanford Website and transmitting those communications to third parties along with unique identifiers used to link the communications to a user's account.

24

    *i.*    *The Snap Pixel*

73.    Snapchat is another social media company that has over 750 million users, including approximately 150 million in the U.S.[33]  Like Meta and LinkedIn, Snapchat generates substantial revenue by selling advertising on its platform.  In 2022, Snapchat generated approximately $4.6 billion in revenue, with roughly 99 percent coming from advertising.[34]

74.    Like Meta and TikTok, Snapchat sells its ability to create "custom audiences" and directly target consumers who are most apt to buy goods or services from the companies advertising on Snapchat's platform.[35]  One of the technologies Snapchat uses to effectively target ads is the Snap Pixel, "a tool that helps advertisers measure results, optimize audience targeting, and build audiences for their ad campaigns."[36]

75.    The Snap Pixel is a free piece of code that companies can install on their websites to track their customers' online activities.  The Snap Pixel "can track a variety of actions on [a] website, such as page views, add-to-cart actions, purchases, and sign-ups."[37]  This user data then allows companies to "create Pixel Custom Audiences to reach people

---

[33]  Sarah   Perez,   Snapchat   announces   750M   monthly   active   users, https://techcrunch.com/2023/02/16/snapchat-announces-750-million-monthly-active-users/ (last visited May 14, 2024).

[34]Matthew   Johnston,   How   Snapchat   Makes   Money, https://www.investopedia.com/articles/investing/061915/how-snapchat-makes-money.asp (last visited May 14, 2024).

[35] https://forbusiness.snapchat.com/advertising/targeting

[36] https://forbusiness.snapchat.com/advertising/snap-pixel

[37] *Id.*

who've already engaged with [the] business" or to "create Lookalike Audiences to reach people who are similar to [] current customers."[38]

76.     The Snap Pixel transmits the user's interactions with the website along with various identifiers and cookies that Snapchat then uses to link the user to a Snapchat account.[39]

*ii.     Google Tracking Code*

77.     Google makes available to web developers a variety of tracking code, including Google Analytics and Google DoubleClick.

78.     The information that is intercepted and transmitted to Google via the Google tracking code includes: the URL of the specific webpage the user is trying to access; the user's IP address; the User-agent, which identifies the user's device platform and browser; the user's geolocation, if available; the Referer, which is the URL of the page on which the user clicked a link to access a new page; event data, which describes how users interact with a website, for example, whether they saw an ad or played a video; and the actual search queries on the site.  In this way, Google tracking code tells Google exactly what a user's browser communicated to the website.

79.     Like with the other Tracking Tools, the user's communications to the website are transmitted to Google together with cookies and other unique identifiers that Google

---

[38] *Id.*
[39]https://businesshelp.snapchat.com/s/article/pixel-direct-implementation?language=en_US

can use to match the communications to individuals who use Google's services.  Google then profits from the intercepted information by selling targeted advertising.

**E.     The Sanford's Use of Session Replay Code**

80.     In  addition  to  the  other  Tracking  Tools,  Sanford  uses  what  is  knowns  as Session Replay Code tools like Microsoft Clarity and Mixpanel to record a user's interactions with its websites.

*i.        Microsoft Clarity*

81.     Sanford utilizes Microsoft Clarity's Session Replay services on its website.

82.     Microsoft owns and operates Clarity, a Session Replay Code. According to Microsoft's website, "Clarity captures the user interactions on your website such as, how the page is rendering, user interactions such as mouse movements, clicks, scrolls, and so on."[40] More  specifically,  Clarity  captures  over  30  different  categories  of  information, including: user-specific information like when the user accessed the website and from what country;  device-specific  information  such  as  the  device,  operating  system,  and  browser used to access the website; and visit-specific information such as a mouse movements, a user's screen swipes, text inputted by the user on the website, and how far down a webpage a user scrolls.[41] Clarity ascribes to each user a specific user ID so that Clarity and the website owner can monitor a user's website visits and interactions over time.[42]

---

[40] https://learn.microsoft.com/en-us/clarity/faq#privacy
[41] *Filters Overview*, Microsoft (Jul. 26, 2022), https://docs.microsoft.com/en-us/clarity/clarity-filters.
[42] *Id.*

83.     Clarity uses information it collects, including "all visitor clicks and scrolls on mobile, desktop, and tablet and automatically generates a heat map" to generate Heatmaps, which are "a visualization tool that makes it easy to analyze aggregated information about how users interact with the website."[43]

84.     Clarity also offers Recordings. "Recordings" allows the website owner to "replay user actions to understand user perspective, traffic source, session timing, and more."[44] It does this by taking user "events" such as "scrolls, clicks/taps, page/screen visits" and generating a "step-by-step visual reconstruction" of a user's site visit.[45]

85.     Clarity offers its customers three "modes" for masking consumer data, all of which fail to adequately protect a user's privacy: strict, balanced, and relaxed.[46] Customers who select the "strict" function will not be able to view any text input by the user.[47] Those who select "balanced" may view all but "sensitive content," which includes phone numbers and email addresses.[48] Finally, those who select "relaxed" are able to view all text input by website users, expect for text in input boxes and dropdowns.[49] Even when a website operator selects the "strict" and "balanced" settings, Clarity is nevertheless capable of collecting text entered by users, including text containing sensitive information.

---

[43] https://learn.microsoft.com/en-us/clarity/heatmaps/heatmaps-overview
[44] https://learn.microsoft.com/en-us/clarity/session-recordings/recordings-overview
[45] *Id.*
[46] https://learn.microsoft.com/en-us/clarity/setup-and-installation/clarity-masking#masking-modes
[47] *Id.*
[48] *Id.*
[49] *Id.*

86.     Clarity stores the data it collects in the Microsoft Aure cloud service, affording Microsoft access to that sensitive information.[50]

ii.     *Mixpanel*

87.     Mixpanel is an event analytics platform that helps its customers track how its users engage with their websites and analyze user data. [51] One method by which Mixpanel accomplishes this task is through the use of Session Replay Code.

88.     Using Mixpanel's platform, Mixpanel customers can not only analyze statistical trends regarding their users' interactions with the website, but also "watch replays of individual users."

89.     On Mixpanel's website, it offers potential customers an illustration of its customer platform.[52] In a column on the left of the platform, Mixpanel lists the names of individual website visitors, identifies how many "events" have occurred, and when the last known event was, as shown below in ***Figure 1***:



*Figure 1*

---

[50] https://learn.microsoft.com/en-us/clarity/faq#privacy
[51] https://docs.mixpanel.com/docs/what-is-mixpanel
[52] https://mixpanel.com/releases/session-replay/

**F.**    **Sanford Aids and Abets the Third-Party Interception of Communications on its Website by Deploying the Tracking Tools**

90.    As an example of how the Tracking Tools operate on Sanford's Website, consider a visitor who opens the website, and navigates to the "Medical Services" webpage. When the visitor does so, the visitor's browser sends a GET Request to Defendant's server, requesting the server to load the webpage displayed below in *Figure 2*:



*Figure 2*

91.   The user next clicks on "Cancer." As the user does so, the user's mouse movement and click are recorded using Clarity's Session Replay Code, as shown in *Figure 3:*



*Figure 3*

92.   At the same time, the Meta Pixel causes the visitor's browser to secretly duplicate the visitor's communication with Sanford's Website, including the specific URL requested, and transmit the private communication to Meta along with unique identifiers used to link the communication to a specific Facebook user, as shown in *Figure 4:*



*Figure 4*

31

93.    Sanford's deployment of the Google tracking code works in much the same way. deployment of the Google tracking code works in much the same way. If a patient inquired about Mammography, the patient's browser would send a GET request to Defendant's server to load the following webpage, as reflected in *Figure 5:*



*Figure 5*

94.    Based on the above examples of how the Tracking Tools operates on Sanford's Website, the third-party technology companies would know (1) that a particular individual—who the technology companies could identify based on their respective accounts—was a patient or prospective patient of Sanford seeking mental health services; (2) that the named patient searched for information regarding diagnosis, medication, and doctors, all related to a specific condition—breast cancer; and (3) the named patient's location and IP address, among other identifiers associated with the patient's computer or cell phone.

95. Using this Personal Information, the technology companies could put the named patient into a Core or Custom Audience for purposes of targeted advertising by Sanford or any other company seeking to advertise its services or products to individuals that fit the named patient's profile. Indeed, after Plaintiff searched for his doctor on Sanford Health's website, he began seeing advertisements targeted at those with back and spine issues.

96. In this way, Sanford, Meta, TikTok, Snapchat, Google, and other third parties profit from Plaintiff's and Class Members' Personal Information without their knowledge, consent, or authorization.

97. Defendant deprived Plaintiff and the Class Members of their privacy rights when it: (a) embedded and implemented the Tracking Tools, which surreptitiously intercepted, recorded, and disclosed Plaintiff's and other online patients' and prospective patients' confidential communications and private information; (b) disclosed patients' and prospective patients' protected information to unauthorized third parties; (c) linked particular patients—Plaintiff and the Class—with their healthcare provider—Sanford and (c) failed to provide notice to or obtain the consent from Plaintiff and the Class Members to share their Personal Information with others.

## G. Exposure of Sensitive Information Creates a Substantial Risk of Harm

98. The Federal Trade Commission ("FTC") has recognized that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most

consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[53]

99.    The FTC also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business. According to the FTC, reasonable data security protocols require, among other things: (1) using industry tested and accepted methods; (2) monitoring activity on networks to uncover unapproved activity; (3) verifying that privacy and security features function properly; and (4) testing for common vulnerabilities or unauthorized disclosures.[54]

100.    The FTC cautions businesses that failure to protect Sensitive Information and the resulting privacy breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[55] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures as an unfair act or practice prohibited by Section 5(a) of the FTC Act.

**H.    Plaintiff's and the Classes' Sensitive Information is Valuable**

101.    As many health care data industry experts have recognized, "[p]atients' medical data constitutes a cornerstone of the big data economy. A multi-billion dollar

---

[53] Statement of FTC Commissioner Pamela Jones Harbour—Remarks Before FTC Exploring Privacy Roundtable, at 2 (Dec. 7, 2009) https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last visited May 14, 2024).
[54] *Start With Security, A Guide for Business,* FTC, https://www.ftc.gov/business-guidance/resources/start-security-guide-business (last visited May 14, 2024).
[55] *See* Taking Charge: What to Do if Your Identity is Stolen, FTC, at 2 (2012), https://www.myoccu.org/sites/default/files/pdf/taking-charge-1.pdf (last visited May 14, 2024).

industry operates by collecting, merging, analyzing[,] and packaging patient data and selling it to the highest bidder."[56]

102.   Thus, the personal, health, and financial information of Plaintiff and the Class Members is valuable and has become a highly desirable commodity. Indeed, one of the world's most valuable resources is the exchange of personal data.[57]

103.   Business News Daily reported that businesses collect personal data (i.e., gender, web browser cookies, IP addresses, and device IDs), engagement data (i.e., consumer interaction with a business's website, applications, and emails), behavioral data (i.e., customers' purchase histories and product usage information), and attitudinal data (i.e., consumer satisfaction data) from consumers.[58] Companies then use this data to impact the customer experiences, modify their marketing strategies, publicly disclose or sell data, and even to obtain more sensitive data that may be even more lucrative.[59]

104.   The power to capture and use customer data to manipulate products, solutions, and the buying experience is invaluable to a business's success. Research shows

---

[56] Niam Yaraghi, *Who should profit from the sale of patient data?,* The Brookings Institution (Nov. 19, 2018), https://www.brookings.edu/blog/techtank/2018/11/19/who-should-profit-from-the-sale-of-patient-data/ (last visited May 14, 2024).

[57] *The world's most valuable resource is no longer oil, but data*, THE ECONOMIST (May 6, 2017), https://www.economist.com/leaders/2017/05/06/the-worlds-most-valuable-resource-is-no-longer-oil-but-data (last visited May 14, 2024).

[58] Max Freedman, *How Businesses Are Collecting Data (And What They're Doing With It)*, BUSINESS NEWS DAILY (Aug. 5, 2022; updated May 30, 2023), https://www.businessnewsdaily.com/10625-businesses-collecting-data.html (last visited May 14, 2024).

[59] *Id.*

35

that organizations who "leverage customer behavioral insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[60]

105.   In 2013, the Organization for Economic Cooperation and Development ("OECD") published a paper entitled "Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value."[61] In this paper, the OECD measured prices demanded by companies concerning user data derived from "various online data warehouses."[62]

106.   OECD indicated that "[a]t the time of writing, the following elements of personal data were available for various prices: USD 0.50 cents for an address, USD 2 [i.e., $2] for a date of birth, USD 8 for a social security number (government ID number), USD 3 for a driver's license number and USD 35 for a military record. A combination of address, date of birth, social security number, credit record and military is estimated to cost USD 55."[63]

107.   Unlike financial information, such as credit card and bank account numbers, the PHI and certain PII cannot be easily changed. Dates of birth and social security numbers are given at birth and attach to a person for the duration of his or her life. Medical histories

---

[60] Brad Brown, et al. *Capturing value from your customer data*, MCKINSEY (Mar. 15, 2017), https://www.mckinsey.com/business-functions/quantumblack/our-insights/capturing-value-from-your-customer-data (last visited May 14, 2024).

[61] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220, OECD PUBLISHING PARIS (Apr. 2, 2013), https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf (last visited May 14, 2024).

[62] *Id.* at 25.

[63] *Id.*

are inflexible. For these reasons, these types of information are the most lucrative and valuable.[64]

108.   Consumers place considerable value on their Personal Information and the privacy of that information. One 2002 study determined that U.S. consumers highly value a website's protection against improper access to their Personal Information, between $11.33 and $16.58 per website. The study further concluded that to U.S. consumers, the collective "protection against errors, improper access, and secondary use of personal information is worth between US$30.49 and $44.62.[65] This data is approximately twenty years old, and the dollar amounts would likely be exponentially higher today.

109.   Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry" in which it described the extensive market for health data and observed that the market for information was both lucrative and a significant risk to privacy.[66]

110.   Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of

---

[64] *Calculating the Value of a Data Breach – What Are the Most Valuable Files to a Hacker?* Donnellon     McCarthy     Enters     (July     21,     2020), https://www.dme.us.com/2020/07/21/calculating-the-value-of-a-data-breach-what-are-the-most-valuable-files-to-a-hacker/ (last visited May 14, 2024).
[65] Il-Horn Hann, Kai-Lung Hui *et al.*, *The Value of Online Information Privacy: Evidence from the USA and Singapore,* at 17, Marshall Sch. Bus., Univ. So. Cal. (Oct. 2002), https://www.comp.nus.edu.sg/~ipng/research/privacy.pdf (last visited May 14, 2024).
[66] *See* Adam Tanner, *How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry*, https://time.com/4588104/medical-data-industry/ (last visited May 14, 2024).

37

brokers who compile the data from providers and other health-care organizations and sell it to buyers."[67]

111.   Indeed, numerous marketing services and consultants offering advice to companies on how to build their email and mobile phone lists—including those seeking to take advantage of targeted marketing—direct putative advertisers to offer consumers something of value in exchange for their personal information.  "No one is giving away their email address for free. Be prepared to offer a book, guide, webinar, course or something else valuable."[68]

112.   There is also a market for data in which consumers can participate.  Personal information has been recognized by courts as extremely valuable. *See In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, 440 F. Supp. 3d 447, 462 (D. Md. 2020) ("Neither should the Court ignore what common sense compels it to acknowledge—the value that personal identifying information has in our increasingly digital economy.  Many companies, like Marriott, collect personal information.  Consumers too recognize the value of their personal information and offer it in exchange for goods and services.").

113.   Several companies have products through which they pay consumers for a license to track their data.  Google, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies that pay for browsing historical information.

---

[67]*See* Christina Farr, *Hospital execs say they are getting flooded with requests for your health data*, https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html (last visited May 14, 2024).
[68]   VERO, HOW TO COLLECT EMAILS ADDRESSES ON TWITTER https://www.getvero.com/resources/twitter-lead-generation-cards/. (last visited May 14, 2024).

114.   Facebook also has paid users for their digital information, including browsing history.  Until 2019, Facebook ran a "Facebook Research" app through which it paid $20 a month for a license to collect browsing history information and other communications from consumers between the ages 13 and 35.

115.   Additionally, healthcare data is extremely valuable to bad actors. Health care records may be valued at up to $250 per record on the black market.[69]

116.   Defendant's privacy violations exposed a variety of Personal Information, including patient status, health conditions and symptoms, physicians, and other highly sensitive data.

117.   PHI, like that exposed here, is likely even more valuable than Social Security numbers and just as capable of being misused.[70] PHI can be ten times more valuable than credit card information.[71]  This is because one's personal health history, including prior illness, surgeries, diagnoses, mental health, prescriptions, and the like cannot be changed

---

[69] *Hackers, Breaches, and the Value of Healthcare Data, SecureLink* (June 30, 2021), https://www.imprivata.com/blog/healthcare-data-new-prize-hackers (last visited May 14, 2024).

[70] *FBI Cyber Division Bulletin: Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain*, FBI (April 8, 2014), https://publicintelligence.net/fbi-health-care-cyber-intrusions/#:~:text=(U)%20Cyber%20actors%20will%20likely,records%20in%20the%20black%20market. (last visited May 14, 2024).

[71] Tim Greene, *Anthem hack: Personal data stolen sells for 10x Price of Stolen Credit Card Numbers*, https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html (last visited May 14, 2024).

or replaced, unlike credit card information and even, under difficult circumstances, Social Security numbers.[72]

118.    Some industry insiders and journalists are even calling hospitals the "brokers to technology companies" for their role in data sharing in the $3 trillion healthcare sector.[73] "Rapid digitization of health records . . . have positioned hospitals as a primary arbiter of how much sensitive data is shared."[74]

## I.    Plaintiff and the Class Had a Reasonable Expectation of Privacy in His Interactions with Defendant's Website

119.    Consumers assume the data they provide to healthcare providers will be kept secure and private.

120.    The majority of Americans consider one of the most important privacy rights to be the need for an individual's affirmative consent before a company collects and shares its' customers' data.[75] A March 2000 BusinessWeek/Harris Poll found that 89 percent of respondents were uncomfortable with web tracking schemes where data was combined with an individual's identity.[76] The same poll found that 63 percent of respondents were uncomfortable with web tracking even where the clickstream data was not linked to

---

[72]*Hackers Selling Healthcare Data in the Black Market*, INFOSEC (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited May 14, 2024).
[73] Melanie Evans, *Hospitals Give Tech Giants Access to Detailed Medical Records*, The Wall Street Journal (Jan. 20, 2020), https://www.wsj.com/articles/hospitals-give-tech-giants-access-to-detailed-medical-records-11579516200 (last visited May 14, 2024).
[74] *Id.*
[75] *Public Opinion on Privacy*, EPIC.ORG, https://archive.epic.org/privacy/survey/. (last visited May 14, 2024).
[76] *Id.*

personally identifiable information.[77] A July 2000 USA Weekend Poll showed that 65 percent of respondents thought that tracking computer use was an invasion of privacy.[78]

121. Patients and website users act consistently with their expectation of privacy. For example, following a new rollout of the iPhone operating software—which asks users for clear, affirmative consent before allowing companies to track users—85 percent of worldwide users and 94 percent of U.S. users chose not to allow such tracking.[79]

122. Like the greater population, Defendant's patients and prospective patients would expect the highly sensitive medical information they provided to Defendant through the Website to be kept secure and private.

## J.    Defendant's Conduct Violates HIPAA

123. Under HIPAA, individuals' health information must be:

properly protected while allowing the flow of health information needed to provide and promote high quality health care and to protect the public's health and well-being. The [Privacy] Rule strikes a balance that permits important uses of information, while protecting the privacy of people who seek care and healing.[80]

124. HIPAA "is a federal law that required the creation of national standards to protect sensitive patient health information from being disclosed without the patient's

---

[77] *Id.*

[78] *Id.*

[79] Margaret Taylor, *How Apple screwed Facebook*, WIRED (May 19, 2021), https://www.wired.co.uk/article/apple-ios14-facebook (last visited May 14, 2024).

[80] U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule (Oct. 19, 2022), https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last visited May 14, 2024).

consent or knowledge."[81] The rule requires appropriate administrative, physical, and technical safeguards to ensure the confidentiality, integrity, and security of electronic protected health information.[82]

125.    HIPAA defines "protected health information" as "individually identifiable health information" that is "created or received by a health care provider" (or similar entities) that "[r]elates to past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual." 45 C.F.R. § 160.103. Identifiers such as patient-status (i.e., information that connects a particular user to a particular health care provider), medical conditions, health symptoms, treatments, and physicians, gathered in this case by the Tracking Tools through Sanford's Website, constitute protected health information.

126.    To ensure protection of this private and sensitive information, HIPAA mandates standards for handling PHI—the very data Defendant failed to protect. According to the U.S. Department of Health and Human Services' Health Information Privacy Bulletin ("HHS Privacy Bulletin"), HIPAA covered entities cannot share PHI or PII to online

---

[81] *Health Insurance Portability and Accountability Act of 1996 (HIPAA)*, Centers for Disease Control and Prevention (June 27, 2022), https://www.cdc.gov/phlp/publications/topic/hipaa.html#:~:text=Health%20Insurance%2 0Portability%20and%20Accountability%20Act%20of%201996%20(HIPAA),-On%20This%20Page&text=The%20Health%20Insurance%20Portability%20and,the%20 patient's%20consent%20or%20knowledge (last visited May 14, 2024).
[82] U.S. Dept. of Health & Human Services: Summary of the HIPAA Privacy Rule.

tracking technology vendors for marketing purposes without first obtaining the individual's

HIPAA-compliant authorization.[83] The HHS Privacy Bulletin explicitly states:

> The HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information (PHI). Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.[84]

127.    The HHS Privacy Bulletin also identifies several harms that may result from

an impermissible disclosure of an individual's PHI, including:

> identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment.

> While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, OCR is providing this reminder that it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule.[85]

---

[83] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH AND HUMAN SERVICES (March 18, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last visited May 14, 2024).

[84] *Id.* (internal citations omitted) (emphasis in original).

[85] *Id.* (internal citations omitted) (emphasis in original).

128. According to HHS, "[s]ome regulated entities may be disclosing a variety of information to tracking technology vendors through tracking technologies placed on the regulated entity's website or mobile app, such as information that the individual types or selects when they use regulated entities' websites or mobile apps." The "information disclosed might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, device IDs, or any unique identifying code."[86]

129. Individually identifiable health information ("IIHI") "collected on a regulated entity's website or mobile app generally is PHI, even if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as in some circumstances IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services."[87] Thus, when a regulated entity, again like Defendant, collects the individual's information, that information connects the individual to the regulated entity (i.e., it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.

130. Further, the HHS Privacy Bulletin makes clear that the use of tracking technologies on the public-facing or "unauthenticated" portion of a hospital's website can likewise result in the unlawful disclosure of PHI. According to the HHS Privacy Bulletin, "in some cases, tracking technologies on unauthenticated webpages may have access to

---

[86] *Id.*
[87] *Id.*

PHI, in which case the HIPAA Rules apply to the regulated entities' use of tracking technologies and disclosures to the tracking technology vendors."[88] For example, "if an individual were looking at a hospital's webpage listing its oncology services to seek a second opinion on treatment options for their brain tumor, the collection and transmission of the individual's IP address, geographic location, or other identifying information showing their visit to that webpage is a disclosure of PHI to the extent that the information is both identifiable and related to the individual's health or future health care."[89]

131.    When Plaintiff communicated with Sanford about his personal health-related information through the Sanford Website, the Tracking Tools intercepted and disclosed those communications to third parties in violation of HIPAA's Privacy Rule, and Sanford never received Plaintiff's and Class Members' HIPAA-compliant consent to disclose those communications.

**CLASS ACTION ALLEGATIONS**

132.    Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of themselves and all others similarly situated, as representatives of the following Classes:

133.    <u>Nationwide class</u>

All persons whose Sensitive Information was disclosed to a third-party through Defendant's Website without authorization or consent during the Class Period.

---

[88] *Id.*
[89] *Id.*

134. <u>Minnesota class</u>

All residents of Minnesota whose Sensitive Information was disclosed to a third-party through Defendant's Website without authorization or consent during the Class Period.

135. Excluded from the Classes are Defendant; officers, directors, and employees of Defendant; any entity in which Defendant has a controlling interest in, is a parent or subsidiary of, or which is otherwise controlled by Defendant; and Defendant's affiliates, legal representatives, attorneys, heirs, predecessors, successors, and assignees. Also excluded are the Judges and Court personnel in this case and any members of their immediate families.

136. Plaintiff reserves the right to modify and/or amend the Class definitions as necessary.

137. All members of the proposed Classes are readily identifiable through Defendant's records.

138. All requirements for class certification under Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are satisfied.

139. **Numerosity.** The members of the Classes are so numerous that joinder of all members of the Classes is impracticable. Plaintiff is informed and believes that the proposed Classes includes over one million people. The precise number of Class Members is unknown to Plaintiff but may be ascertained from Defendant's records.

140. **Commonality and Predominance.** This action involves common questions of law and fact to the Plaintiff and Class Members, which predominate over any questions

only affecting individual Class Members.  These common legal and factual questions include, without limitation:

141.    Whether Plaintiff's and Class Members' communications with Defendant's Website were unlawfully intercepted and disclosed to third parties;

142.    Whether Defendant made use of and derived a benefit from the intercepted communications;

143.    Whether the interception and disclosure of Plaintiff's and Class Members' communications were consensual;

144.    Whether Defendant owed Plaintiff and the other Class Members a duty to adequately protect their Sensitive Information;

145.    Whether Defendant owed Plaintiff and the other Class Members a duty to secure their Sensitive Information from disclosure via third-party tracking technologies;

146.    Whether Defendant owed Plaintiff and the other Class Members a duty to implement reasonable data privacy protection measures because Defendant accepted, stored, created, and maintained highly sensitive information concerning Plaintiff and the Class;

147.    Whether Defendant knew or should have known of the risk of disclosure of data through third-party tracking technologies;

148.    Whether Defendant breached its duty to protect the Sensitive Information of Plaintiff and other Class Members;

149.    Whether Defendant knew or should have known about the inadequacies of its privacy protection;

150. Whether Defendant failed to use reasonable care and reasonable methods to safeguard and protect Plaintiff's and the Class's Sensitive Information from unauthorized disclosure;

151. Whether proper data security measures, policies, procedures and protocols were enacted within Defendant's computer systems to safeguard and protect Plaintiff's and the Class's Sensitive Information from unauthorized disclosure;

152. Whether Defendant's conduct was the proximate cause of Plaintiff's and the Class's injuries;

153. Whether Plaintiff and the Class had a reasonable expectation of privacy in their Sensitive Information;

154. Whether Plaintiff and the Class suffered ascertainable and cognizable injuries as a result of Defendants' misconduct;

155. Whether Plaintiff and the Class are entitled to recover damages; and

156. Whether Plaintiff and the Class are entitled to other appropriate remedies including injunctive relief.

157. Defendant engaged in a common course of conduct giving rise to the claims asserted by Plaintiff on behalf of themselves and the Classes. Individual questions, if any, are slight by comparison in both quality and quantity to the common questions that control this action.

158. **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Information, like that of every other Class member, was

improperly disclosed by Defendant.  Defendant's misconduct impacted all Class Members in a similar manner.

159.  **Adequacy.**  Plaintiff will fairly and adequately represent and protect the interest of the members of the Classes and have retained counsel experienced in complex consumer class action litigation and intend to prosecute this action vigorously.  Plaintiff has no adverse or antagonistic interests to those of the Classes.

160.  **Superiority.**  A class action is superior to all other available methods for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class Members are relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. The adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudications of the asserted claims.  There will be no difficulty in managing this action as a class action, and the disposition of the claims of the Class Members in a single action will provide substantial benefits to all parties and to the Court.  Absent a class action, individuals like Plaintiff would find the cost of litigating their claims prohibitively high and would have no effective remedy for monetary relief.

161.  Class Certification under Fed. R. Civ. P. 23(b)(2) is also appropriate. Defendant has acted or refused to act on grounds that apply generally to the Classes, thereby making monetary, injunctive, equitable, declaratory, or a combination of such relief appropriate. As Defendant continues to engage in the practices described herein, the risk of future harm to Plaintiff and the Classes remains, making injunctive relief appropriate. The prosecution of separate actions by all affected individuals with dealings similar to

Plaintiff's, even if possible, would create a substantial risk of (a) inconsistent or varying adjudications with respect to individual employees, which would establish potentially incompatible standards of conduct for Defendant, and/or (b) adjudications with respect to individual employees which would, as a practical matter, be dispositive of the interests of the other employees not parties to the adjudications, or which would substantially impair or impede the ability to protect the interests of the Classes. Further, the claims of individual employees in the defined Classes are not sufficiently large to warrant vigorous individual prosecution considering all of the concomitant costs and expenses.

## LEGAL CLAIMS

### COUNT I
### INVASION OF PRIVACY
*(On Behalf of Plaintiff and the Nationwide Class)*

162.   Plaintiff and the Class have an objective, reasonable expectation of privacy in their Website Communications, particularly those containing sensitive medical information.

163.   Plaintiff and the Class members did not consent to, authorize, or know about Defendant's intrusion of their privacy at the time it occurred. Plaintiff and the Class members never agreed that Defendant could disclose their Website Communications to its vendors and other third parties.

164.   Plaintiff and the Class members had an objective interest in precluding the dissemination and/or misuse of their information and communications and in conducting

their personal activities without intrusion or interference, including the right to not have their personal information intercepted and utilized for business gain.

165. Through its privacy violations, Defendant disclosed Plaintiff's and the Class's highly private Sensitive Information to third parties, without prior consent or authorization. This disclosure is offensive to the reasonable person and Plaintiff's and the Class's medical or other private information are not matter of public concern.

166. Additionally, Defendant has intentionally intruded on Plaintiff's and the Class's private life, seclusion, or solitude, without consent. This conduct is highly objectionable to a reasonable person and constitutes an egregious breach of the social norms underlying the right to privacy.

167. As a direct and proximate result of Defendant's unauthorized disclosure of Plaintiff's and the Class's private data, including intimately personal facts in the form of their Website Communications, Plaintiff and Class members suffered and continue to suffer harm and injury. Given the monetary value of individual personal information, Defendant deprived Plaintiff and Class members of the economic value of their interactions with Defendant's website, without providing proper consideration for Plaintiff's and Class members' property.

168. Further, Defendant has improperly profited from its invasion of Plaintiff's and the Class members' privacy in its use of their data for its economic value.

169. Plaintiff and the Class members are entitled to damages, including compensatory, punitive, and/or nominal damages in an amount to be proven at trial.

170.    To the extent Defendant's conduct is ongoing, and it continues to unlawfully disclose the communications of Plaintiff and the Class members any time they use or provide information to Defendant through its website or application without their consent, Plaintiff and the Class members are entitled to declaratory and injunctive relief. This will prevent future unlawful and unauthorized disclosure of Plaintiff's and the Class members' Sensitive Information.

## COUNT II
## VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA") (18 U.S.C. § 2511(1))
*(On Behalf of Plaintiff and the Nationwide Class)*

171.    Plaintiff realleges and incorporates by reference every allegation contained in the paragraphs above as though fully stated herein.

172.    The ECPA protects against the intentional interception, attempted interception, or the procurement of another person to intercept or attempt to intercept any wire, oral, or electronic communication. *See* 18 U.S.C. § 2511(1).

173.    The ECPA further provides any person who:

(c) intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

(d) intentionally uses, or endeavors to use, the contents of any wire, oral, or electronic  communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection;

> Shall be punished as provided in subsection (4) or shall be subject to suit as provided in subsection (5).

18 .S.C. § 2511(1)(c) & (d).

174.    Pursuant to 18 U.S.C. § 2511(5)(b), for violations of the ECPA, the Court "may use any means within its authority to enforce an injunction issued under paragraph (ii)(A) and shall impose a civil fine of not less than $500 for each violation of the injunction. Additionally, 18 U.S.C. § 2520 provides that "any person whose wire, oral or electronic communication is intercepted, disclosed or intentionally used in violation of Chapter 119, may recover from the person or entity that engaged in the violation in a civil action.

175.    The transmission of Plaintiff's and the Class members' Sensitive Information violates the ECPA. First, the transmissions from Plaintiff and the Class members to Defendant, through Defendant's Website (www.sanfordhealth.com) are communications pursuant to 18 U.S.C. § 2510(12).

176.    "Interception" means "the acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents… include any information concerning the substance, purport, or meaning of that communication. 18 U.S.C.§ 2510(4), (8).

177.    "Content" means "any information concerning the identity of the parties to such communication or the existence, contents, substance, purport, or meaning of that communication." U.S.C.§ 2510(8).

178. "Intercepting device" or the "Electronic, mechanical or other device" means any device or apparatus which is capable of transmitting, receiving, amplifying, or recording a wire or oral communication. U.S.C.§ 2510(5). Here, Plaintiff's and the Class members' browsers and computing devices and Defendant's webservers, website, and the Tracking Tools Defendant deployed are all "devices" for the purposes of the ECPA.

179. "Electronic communication" means any communication made in whole or in part through the use of facilities for the transmission of communications by the signs, signals, writing or data between the point of origin and the point of reception. U.S.C.§ 2510(2).

180. By employing and embedding Tracking Tools on Defendant's websites, Defendant intentionally violated the ECPA, through its interception, attempt at interception, and its procurement of third parties to intercept the electronic communications of Plaintiff and the Class members.

181. Indeed, Defendant willfully used or attempted to use the contents of Plaintiff's and the Class members' electronic communications, knowing that the information was obtained through interception.

182. Defendant's use of Tracking Tools unlawfully and intentionally disclosed Plaintiff's and the Class members' Sensitive Information to third parties, including but certainly not limited to, information regarding treatments, medications, scheduling, location, procedures, test results, and diagnosis. These intentional acts violate 18 U.S.C. §§ 2511(1)(a), 2511(1)(c), 2511(1)(d).

183.    Additionally, Defendant had no legitimate purpose for intentionally intercepting the contents of Plaintiff's and the Class members' private, and personal electronic communications. And even if Defendant could identity some legitimate purpose, which seems highly unlikely, it would not outweigh the egregious breach and invasion of privacy Defendant has committed against Plaintiff and the Class members.

184.    At no time did Plaintiff and the Class members provide their consent to Defendant's disclosure of their Sensitive Information to third-parties.

185.    Further, Defendant has improperly profited from its invasion of Plaintiff's and the Class members' privacy in its use of their data for its economic value.

186.    Plaintiff and the Class members are entitled to damages, including compensatory and/or nominal damages in an amount to be proven at trial.

187.    To the extent Defendant's conduct is ongoing, and it continues to unlawfully disclose the communications of Plaintiff and the Class members any time they use or provide information to Defendant through its Website or application without their consent, Plaintiff and the Class members are entitled to declaratory and injunctive relief. This will prevent future unlawful and unauthorized disclosure of Plaintiff's and the Class members' Sensitive Information.

## COUNT III
## VIOLATION OF MINNESOTA UNIFORM DECEPTIVE TRADE PRACTICES ACT ("MUDTPA") § 325D.43-48
*(On behalf of Plaintiff and the Nationwide Class, or Alternatively the Minnesota Class)*

188.    Plaintiff realleges and incorporates by reference every allegation contained in the paragraphs above as though fully stated herein.

189. Defendant is subject to the rules and statutory requirements of Minn. Stat. § 325D.44, because it advertised, offered, or sold goods or services in Minnesota and therefore engaged in business directly or indirectly affected people in Minnesota.

190. The MDUTPA prohibits deceptive trade practices in person's business, vocation, or occupation, *See* Minn. Stat. § 325D.44, subd. 1, including where the person:

represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have; Minn. Stat. § 325D.44, subd.1(5).

represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; Minn. Stat. § 325D.44, subd.1(7).

191. Defendant engaged in unfair, abusive, and deceptive acts, omissions, and practices in connection with consumer transactions, in violation of Sections Minn. Stat. § 325D.44, subd. 1(5) & (7).

192. Defendant's representations and omissions include both implicit and explicit representations through:

    a.    Failing to implement and maintain reasonable privacy measures to protect Plaintiff's and the Class's Sensitive Information, which was a direct and proximate cause of the Privacy violations described herein;

    b.    Failing to identify and remediate foreseeable privacy risks and adequately maintain privacy measures despite knowing the risk disclosure of patients' Sensitive Information, which was a direct and proximate cause of the Privacy violations;

    c.    Failing to comply with common law and statutory duties pertaining to the privacy of Plaintiff's and the Class's Sensitive Information, including duties imposed by the HIPAA, 45 C.F.R. § 160.102 and the FTC Act, 15 U.S.C. § 45, which was a direct and proximate cause of the Privacy violations;

56

d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and Class's Sensitive Information, including by implementing and maintaining reasonable privacy protection measures;

e.   Misrepresenting that it would comply with common law and statutory duties pertaining to the privacy of Plaintiff's and Class's Sensitive Information, including duties imposed by the HIPAA, 45 C.F.R. § 160.102;

f.   Omitting, suppressing, and concealing the material fact that it did not reasonably or adequately protect Plaintiff's and Class's Sensitive Information; and

g.   Omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and Class's Sensitive Information, including duties imposed by HIPAA, 45 C.F.R. § 160.102 or the FTC Act, 15 U.S.C. § 45.

193.   Defendant's acts and practices were "unfair" because they caused or were likely to cause substantial injury to patients which was not reasonably avoidable by patients themselves and not outweighed by countervailing benefits to patients or to competition.

194.   The injury to patients from Defendant's conduct was and is substantial because it was non-trivial and non-speculative; and involved a monetary injury and an unwarranted risk to the safety of their Sensitive Information.

195.   Plaintiff and the Class could not have reasonably avoided injury because Defendant's business acts and practices unreasonably created or took advantage of an obstacle to the free exercise of patient healthcare decision-making and information gathering.   By withholding important information from patients about the inadequacy of its privacy protections and Defendant's intentional use of Pixel on its website, Defendant

57

created an asymmetry of information between it and patients that precluded patients from

taking action to avoid or mitigate injury.

196. Defendant also engaged in "deceptive" acts and practices in violation of

Minn. Stat. § 325D.44, including:

> 1.    Misrepresenting that the subject of a consumer transaction has performance, characteristics, or benefits it does not have which the supplier knows or should reasonably know it does not have; and
> 2.    Misrepresenting that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not.

197. Specifically, Defendant made the following misrepresentations:

> Visitors can browse all Sanford Health websites without providing any personal information. Certain pages contain forms that give visitors the option of providing us with contact information including name, physical address, phone, and email address if you choose to contact us. Providing this information is voluntary. The information you submit is shared internally with Sanford Health employees who need this information to help respond to your request or improve Sanford Health operations. Information submitted may also be used to evaluate the technical functionality of our website. Information provided may also be utilized to address inappropriate use or communications associated with our website.[90]

198. Plaintiff and the Class had a reasonable expectation of privacy and relied on

Defendant to protect the Sensitive Information provided to it and created by it, especially

because, medical facilities are always required to maintain confidentiality of patient

records, with very limited exceptions.

199. Defendant knew or should have known that failing to adequately protect

---

[90] https://www.sanfordhealth.org/privacy-statement (last visited on July 2, 2025).

patient information could cause substantial harm.  Moreover, through its various policies, Defendant acknowledged its obligation to reasonably safeguard sensitive information against unauthorized disclosure of Sensitive Information to third-parties like Meta, Google, Microsoft, and others.

200.    Had Defendant disclosed to Plaintiff and the Class that the use of its Tracking Tools disclosed to third-parties sensitive, medical information, Defendant would have been unable to continue this type of business practice and it would have been forced to adopt reasonable data privacy measures and comply with the law.  Defendant was trusted with sensitive and valuable PII and PHI regarding millions of patients, including Plaintiff and the Class.  Defendant accepted the responsibility of protecting the data while keeping the extent of the tracking technologies used on its site and application secret from the public. Accordingly, Plaintiff and the Class acted reasonably in relying on Defendant's misrepresentations and omissions, the truth of which they could not have discovered.

201.    Defendant had a duty to disclose the above-described facts due to the circumstances of this case, the sensitivity and extensivity of the PII and PHI in its possession, and the generally accepted professional standards.  This duty arose due to the representations and relationship between Defendant and Plaintiff and the Class as described herein.  Defendant had exclusive or superior knowledge of the practices engaged in where private information related to health and safety was shared with third-parties which Plaintiff and the members of the class had no reasonable manner of obtaining in advance, giving rise to a further duty to disclose.

202.    As a direct and proximate result of Defendant's unfair, abusive, and

deceptive acts or practices, Plaintiff and the Class have suffered and will continue to suffer injury and monetary damages, as described herein, including but not limited to; loss of value of their PII and PHI; overpayment for Defendant's services, and the deliberate violation of their privacy as alleged herein.

203.   Plaintiff and the Class seek all relief allowed by law, including injunctive relief, costs and attorneys' fees, and remedies cumulative.

**COUNT IV**
**VIOLATION OF THE MINNESOTA HEALTH RECORDS ACT**
**Minn. Stat. §§ 144.291 and 144.293**
*(On behalf of Plaintiff and the Nationwide Class, or Alternatively the Minnesota Class)*

204.   Plaintiff realleges and incorporates by reference every allegation contained in the paragraphs above as though fully stated herein.

205.   Under the Minnesota Health Records Act ("MHRA"), "health record" means any information, whether oral or recorded in any form or medium, that relates to the past, present, or future physical or mental health or condition of a patient; the provision of healthcare to a patient; or the past, present, or future payment for the provision of healthcare to a patient. Minn. Stat. § 144.291, subd. 2(c).

206.   The information Plaintiff and the Class members exchanged with Defendant on its website concerned the past, present, and future physical or mental health or condition and the provision of healthcare. Specifically, Plaintiff has included allegations related to information and exchanges on Defendant's website that disclosed his specific health care providers, and specific procedures, specifically his back surgery. Thus, that information constitutes "health records" as that term is defined in the MHRA.

60

207. Plaintiff and the Class members are "patients" at all relevant times as that term is defined under the MHRA. Minn. Stat. § 144.291, subd. 2(g).

208. Under the MHRA, it is unlawful for a third party to access a patient's health records from a provider, or a person who receives records from a provider, without the patient or the patient's legally authorized representative's consent, specific authorization in law, or a representative from a provider that holds a signed and dated consent from the patient authorizing the release. Minn. Stat. § 144.293, subd. 2(1-3).

209. Defendant's use of Tracking Tools resulted in Defendant providing a third party with Plaintiff's and the Class member's health records and, furthermore, allowed a third party to access, without authorization, Plaintiff's and the Class members' health records.

210. Neither Plaintiff nor the Class members consented to or otherwise authorized Defendant to share their health records with Meta, Google, Snapchat, Microsoft or any other third-party.

211. Under the MHRA, a provider or other person who causes an unauthorized release of a health record by negligently releasing the health record is liable to the patient for compensatory damages, plus costs and reasonable attorney fees. Minn. Stat. § 144.298, subd. 2. As a result of Defendant's violations of the MHRA, Plaintiff and the other Class members seek all damages authorized by law, including compensatory damages plus costs, and reasonable attorney fees.

## COUNT V
## VIOLATION OF THE MINNESOTA CONSUMER FRAUD ACT
### Minn. Stat. § 325F.69 et seq
*(On behalf of Plaintiff and the Nationwide Class, or Alternatively the Minnesota Class)*

212.    Plaintiff realleges and incorporates by reference every allegation contained in the paragraphs above as though fully stated herein.

213.    Defendant's practices were and are in violation of Minnesota's Consumer Fraud Act, Minnesota Statutes § 325F.69, et seq.

214.    Defendant is a person as defined by Minnesota Statute § 325F.68, subd. 3.

215.    The medical services that Defendant markets, provides, offers and/or sells are considered merchandise. Minnesota Statute § 325F.69, Subd. 2.

216.    As alleged, Defendant engaged in deceptive acts and practices in the form of misrepresentations and omissions while conducting business throughout Minnesota to thousands of individuals seeking medical care. Specifically, Defendant represented that it lawfully, and in accordance with healthcare standard practices, protected the confidentiality and privacy of its patients and also  material information regarding its use of Tracking Tools on its website to the public at large.  Defendant did not protect the confidentiality or privacy of its patients and it does in fact use Tracking Tools on its website which the general public can access online.

217.    Defendant did not disclose its use of the Tracking Tools on its website or that it was sharing private, sensitive patient data with the third-parties like Meta, Microsoft, Google, and others without patients' consent.   Defendant's failure to inform patients or potential patients of its use of Tracking Tools on its website and its disclosure of patient

and website visitors' data to third parties was likely to, and did deceive Plaintiff and the Class members.

218. As a direct result of Defendant's unlawful deceptive practices, Plaintiff and the Class members suffered injuries including the loss of their personal, private data.

219. Plaintiff and the Class members seek an award of damages for violations of Minn. Stat. § 325.69 pursuant to Minn. Stat. § 8.31, subd. 3a and all other appropriate relief.

**COUNT VI**
**UNJUST ENRICHMENT**
*(On behalf of Plaintiff and the Nationwide Class)*

220. Plaintiff realleges and incorporates by reference every allegation contained in the paragraphs above as though fully stated herein.

221. Plaintiff and the Class members provided their Sensitive Information to Defendant for the purposes of receiving healthcare services or healthcare related information and knowledge. Defendant receives a benefit from its use of Plaintiff's and the Class members' Sensitive Information, including monetary compensation and savings. Defendant intentionally collected and used Plaintiff's and the Class members' Sensitive Information for its own gain, without consent or authorization.

222. Defendant unjustly retained those benefits, which include savings on marketing and increased profits, at the expense of Plaintiff and the Class members and this conduct damaged Plaintiff and the Class members. Plaintiff and the Class members were not compensated by Defendant for the data they provided.

223. It would be inequitable and unjust for Defendant to retain any of the profit or

63

other benefits derived from the secret, unfair, and deceptive data tracking methods Defendant employes on its Website.

224.   The Court should require Defendant to disgorge all unlawful or inequitable proceeds that it received into a common fund for the benefit of Plaintiff and the Class members, and order other such relief as the Court may deem just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays for judgment in his favor as follows:

a. Certification the Class pursuant to the provisions of Fed. R. Civ. P. 23(b)(2) and (b)(3) and an order that notice be provided to all Class Members;

b. Designation of Plaintiff as representative of the Class and the undersigned counsel as Class Counsel;

c. An award of damages in an amount to be determined at trial or by this Court;

d. An order for injunctive relief, enjoining Defendant from engaging in the wrongful and unlawful acts described herein;

e. An award of statutory interest and penalties;

f. An award of costs and attorneys' fees; and

g. Such other relief the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues so triable.

Respectfully submitted,

Dated: August 5, 2025

*/s/ Rachel K. Tack*

Brian C. Gudmundson (MN Bar No. 0336695)
Rachel K. Tack (MN Bar No. 0399529)
Madison M. DeMaris (MN Bar No. 0403467)
**ZIMMERMAN REED LLP**
1100 IDS Center, 80 South 8th Street
Minneapolis, MN  55042
Telephone: (612) 341-0400
brian.gudmundson@zimmreed.com
rachel.tack@zimmreed.com
madison.demaris@zimmreed.com

***Attorneys for Plaintiffs***

65