**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| Robert Hanson, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br>v.<br><br>Sanford Health Corp.,<br><br>Defendant. | Case No. 25-cv-03129-PJS-LIB<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S RULE 12 MOTION TO DISMISS** |

## TABLE OF CONTENTS


INTRODUCTION .......... 1

BACKGROUND .......... 2

LEGAL STANDARD .......... 5

ARGUMENT .......... 5

I. Plaintiff has Sufficiently Plead a Claim for Invasion of Privacy .......... 5

- A. Sanford Intruded on Plaintiff's Seclusion. .......... 6
- B. Sanford's Intrusion was Highly Offensive and Violated a Reasonable Expectation of Privacy .......... 8

II. Plaintiff States an MHRA Claim. .......... 10

III. Plaintiff Has Sufficiently Pleaded that Sanford Violated the ECPA. .......... 14

- A. The "Party Defense" does not apply here. .......... 15
  - 1. Sanford violated the ECPA by secretly duplicating and forwarding communications .......... 16
  - 2. The Crime-Tort Exception applies to Sanford's Party Defense .......... 18
    - a. Sanford's intentional HIPAA violation is a criminal purpose. .......... 19
    - b. Invasion of Privacy is a Tortious Purpose .......... 21

IV. Plaintiff States a MDTPA Claim .......... 22

- A. Plaintiff Has Standing Under the MDTPA .......... 22
- B. Plaintiff Stated His Claim with Particularity .......... 25
- C. Sanford's Pre-existing Harm Argument Lacks Legal Support .......... 27
- D. Sanford's Notice Argument is Inappropriate for the Motion to Dismiss Stage. .......... 28

V. Plaintiff Alleges a Casual Nexus as Required by the MCFA .......... 29

VI. Class Definition .......... 31

CONCLUSION ........................................................................................................ 34

# TABLE OF AUTHORITIES

## Cases

*AbbVie, Inc. v. Ellison*,
777 F. Supp. 3d 971 (D. Minn. 2025)....................22

*Adams v. U.S. Bancorp.*,
635 F. Supp. 3d 742 (D. Minn. 2022)....................31

*Baker v. Best Buy Stores, LP*,
812 N.W.2d 177 (Minn. Ct. App. 2012)....................30

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................5

*Blue Cross and Blue Shield of Minnesota v. Wells Fargo Bank, N.A.*,
2012 WL 1343147 (D. Minn. April 18, 2012)....................25

*Boseovski v. McCloud Healthcare Clinic, Inc.*,
2020 WL 68578 (E.D. Cal. Jan. 7, 2020)....................16

*Brown v. Google*,
525 F. Supp. 3d 1049 (N.D. Cal.)....................19

*Chen v. Target Corp.*,
2022 WL 1597417 (D. Minn. May 19, 2022)....................34

*Cleveland v. Whirlpool Corp*.,
550 F. Supp. 3d 660 (D. Minn. 2021)....................23, 24

*Delgado v. Ocwen Loan Servicing, LLC*,
2014 WL 4773991 (E.D.N.Y. Sept. 24, 2014)....................24

*Deteresa v. Am. Broadcasting Cos., Inc*.,
121 F.3d 460 (9th Cir. 1997)....................19

*Doe v. Smith*,
429 F.3d 706 (7th Cir. 2005)....................16

*Donelson v. Ameriprise Fin. Servs.*,
999 F.3d 1080 (8th Cir. 2021)....................31

*E–Shops Corp. v. U.S. Bank Nat'l Ass'n*,
678 F.3d 659 (8th Cir. 2012) ....................25, 26

*Ford v. TD Ameritrade Holding Corp.*,
995 F.3d 616 (8th Cir. 2021) ....................33

*Frasco v. Flo Health, Inc.*,
349 F.R.D. 557 (N.D. Cal. 2025)....................32

*Furlow v. Madonna Summit of Byron*,
2020 WL 413356 (Minn. Ct. App. Jan. 27, 2020)....................12

*Gelbard v. U.S.*,
408 U.S. 41 (1972) ....................14

*Gen. Telephone Co. of Southwest v. Falcon*,
457 U.S. 147 (1982) ....................32

*Goldberg v. McCormick*,
2018 WL 579407 (D. Minn. Jan. 26, 2018) ....................6

*Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp*,
850 N.W.2d 682 (Minn. 2014) ....................30

*Group Health Plan, Inc. v. Philip Morris Inc.*,
621 N.W.2d 2 (Minn. 2001) ....................27

*Hamilton v. Palm*,
621 F.3d 816 (8th Cir. 2010) ....................5

*Holtzbauer v. Allina Health Sys.*,
23 N.W.3d 608 (Minn. Ct. App. 2025)....................12

*Hudock v. LG Electronics*,
2017 WL 1157098 (D. Minn. Mar. 27, 2017) ....................24

*In re Facebook, Inc. Internet Tracking Litig.*,
956 F.3d 589 (9th Cir. 2020) ....................14, 17

*In re Google Cookie*,
806 F.3d 125 (3rd Cir. 2015) ....................18, 21

*In re Group Health Plan Litig.*,
709 F. Supp. 3d 707 (D. Minn. 2023) ........ Passim

*In re Meta Pixel Healthcare Litig.*,
2022 WL 17869218 (N.D. Cal., Dec. 22, 2022) ........ 14, 21

*In re Pharmatrak*,
329 F. 3d 9 (1st Cir. 2003) ........ 14, 17

*Joffe v. Google*,
746 F.3d 920 (9th Cir. 2013) ........ 17

*Keech v. Sanimax USA, LLC*,
2019 WL 79005 (D. Minn. Jan. 2, 2019) ........ 32

*Kennedy v. City of Braham*,
67 F. Supp. 3d 1020 (D. Minn. 2014) ........ 9

*Khoday v. Symantec Corp.*,
858 F. Supp. 2d 1004 (D. Minn. 2012) ........ 29

*Knotts v. Nissan N.A., Inc.*,
346 F. Supp. 3d 1310 (D. Minn. 2018) ........ 23

*Lake v. Wal-Mart Stores, Inc.*,
582 N.W.2d 231 (Minn. 1998) ........ 6

*Le v. Kohls Dep't Stores, Inc.*,
160 F. Supp. 3d 1096 (E.D. Wis. 2016) ........ 24

*Legacy Gymnastics, LLC v. Arch Ins. Co.*,
2021 WL 2371503 (W.D. Mo. June 9, 2021) ........ 32

*Lehman v. Zumbrota-Mazeppa Pub. Schs.*,
2005 WL 894756 (Minn. Ct. App. Apr. 19, 2005) ........ 8

*Leimer v. State Mut. Life Assur. Co. of Worcester, Mass.*,
108 F.2d 302 (8th Cir. 1940) ........ 5

*Linn v. BCBSM, Inc.*,
905 N.W.2d 497 (Minn. 2018) ........ 12

*Lonegan v. Hasty*,
436 F. Supp. 2d 419 (E.D.N.Y. 2006)....................16

*Luckey v. Alside, Inc.*,
245 F. Supp. 3d 1080 (D. Minn. 2017)....................27

*Mallak v. Aitkin Cnty.*,
9 F. Supp. 3d 1046....................9

*McGregor v. Uponor, Inc.*, No.,
2010 WL 55985 (D. Minn. Jan. 4, 2010)....................25

*Mekhail v. N. Mem'l Health Care*,
726 F. Supp. 3d 916 (D. Minn. 2024)....................Passim

*Messner v. Northshore Univ. HealthSystem*,
669 F.3d 802 (7th Cir. 2012)....................34

*Mike v. Mike*,
2004 WL 2801585 (D. Minn. 2004)....................14

*Nobels v. State Farm Mut. Auto. Ins. Co.*,
2012 WL 4090347 (W.D. Mo. Sept. 17, 2012)....................31

*Okash v. Essentia Health*,
2024 WL 1285779 (D. Minn. Mar. 26, 2024)....................8, 26

*Okash v. Essentia Health*,
2025 WL 642913 (D. Minn. Feb. 27, 2025)....................11, 13

*Peavy v. WFAA-TV, Inc.*,
221 F.3d 158 (5th Cir. 2000)....................16

*Planned Parenthood v. Ctr. for Med. Progress*,
214 F. Supp. 3d 808 (N.D. Cal. 2016)....................19, 21

*Ransom v. VFS, Inc.*,
918 F. Supp. 2d 888 (D. Minn. 2013)....................25

*Rhoades v. Lourey*,
2019 WL 1006804 (Minn. Ct. App. Mar. 4, 2019)....................12

*Samaha v. City of Minneapolis*,
525 F. Supp. 3d 933 (D. Minn. 2021) ........ 32

*Soular v. N. Tier Energy LP*,
2015 WL 5024786 (D. Minn. Aug. 25, 2015) ........ 33, 34

*State by Humphrey v. Philip Morris Inc.*,
551 N.W.2d 490 (Minn. 1996) ........ 24

*Stubbs v. N. Mem'l Med. Ctr.*,
448 N.W.2d 78 (Minn. Ct. App. 1989) ........ 30

*Sussman v. Am. Broad. Cos., Inc.*,
186 F.3d 1200 (9th Cir. 1999) ........ 18, 21

*Swarthout v. Mut. Serv. Life Ins. Co.*,
632 N.W.2d 741 (Minn. Ct. App. 2001) ........ 6, 8

*Triple S Farms LLC v. DeLaval Inc.*,
2023 WL 2333410 (D. Minn. Mar. 2, 2023) ........ 32

*U.S. v. Harpel*,
493 F.2d 346 (10th Cir. 1974) ........ 14

*United States v. Szymuszkiewicz*,
622 F.3d 701 (7th Cir. 2010) ........ 17

*Valentine v. WideOpen West Fin., LLC*,
288 F.R.D. 407 (N.D. Ill. 2012) ........ 16

*Varela v. State Farm Mut. Auto. Ins. Co.*,
2023 WL 1971753 (D. Minn., 2023) ........ 29, 30

*Walker v. World Tire Corp.*,
563 F.2d 918 (8th Cir. 1977) ........ 32

*Watkins v. L.M. Berry & Co.*,
704 F.2d 577 (11th Cir. 1983) ........ 14

*Yath v. Fairview Clinics, NP*,
767 N.W.2d 34 (Minn. Ct. App. 2009) ........ 10, 11

**Statutes**

18 U.S.C. § 2511(1)(a)–(e) .......... 14
18 U.S.C. § 2511(2)(d) .......... Passim
42 U.S.C. § 1320d-6 .......... 20
Minn. Stat. § 144.291(c) .......... 11
Minn. Stat. § 144.293, subd. 2 .......... 10
Minn. Stat. § 325D.13 .......... 27
Minn. Stat. § 325D.45 .......... 22
Minn. Stat. § 325D.45, subd. 1 .......... 23
Minn. Stat. § 325F.67 .......... 27
Minn. Stat. § 325F.68, subd. 2 .......... 29
Minn. Stat. § 325F.69 .......... 27
Minn. Stat. § 325F.69, subd. 1 .......... 29

**Rules**

Fed. R. Civ. P. 9(b) .......... 25, 30
Fed. R. Civ. P. 12(b)(6) .......... 1

Plaintiff Robert Hanson ("Plaintiff") respectfully submits this memorandum of law in opposition to Sanford Health's ("Sanford" or "Defendant") Motion to Dismiss Plaintiff's Complaint pursuant to Fed. R. Civ. P. 12(b)(6).

## INTRODUCTION

This is a proposed class action arising from Sanford Health's years-long practice of surreptitiously sharing patients' and prospective patients' Sensitive Information with Meta, Google, Microsoft, Snapchat, and others, without patient consent—all to further Sanford's own marketing efforts. Plaintiff Robert Hanson is among those whose privacy Sanford violated. Specifically, Plaintiff Hanson accessed https://www.sanfordhealth.org in hopes of obtaining further information regarding his surgeon, and he reasonably expected those communications would remain private. They did not, and Plaintiff Hanson subsequently experienced targeted ads relating to the very condition for which he was seeking care from Sanford.

Upon learning of Sanford's deceptive practices, Plaintiff filed a Complaint on behalf of himself and all others similarly situated in which he alleged that Sanford: invaded his privacy; violated the Electronic Communications Privacy Act ("ECPA"), the Minnesota Unfair and Deceptive Trade Practices Act ("MDTPA"), Minnesota Health Records Act (MHRA), and the Minnesota Consumer Fraud Act ("MCFA"); and unjustly enriched itself by benefiting off his data. Sanford now moves to dismiss all of Plaintiff's claims except for unjust enrichment and to strike Plaintiff's class allegations. The Court should deny the motion in its entirety for five reasons.

First, Plaintiff pleads an invasion-of-privacy claim by alleging that Sanford intruded on his privacy by deploying Tracking Tools on Plaintiff's web browser while on the Sanford website without Plaintiff's knowledge or consent. Second, Plaintiff pleads that Sanford disclosed his "medical records" as defined by the unambiguous language of the MHRA. Third, Plaintiff likewise states a claim under the ECPA because Sanford intercepted his communications without authorization and because the party-to-a-communication defense does not apply. Specifically, Sanford's violation of HIPAA provisions and illicit privacy intrusions are crimes and torts that implicate liability even where one party (Sanford) agreed to the disclosure of patient-healthcare provider communications. Fourth, Plaintiff has stated his MDTPA and MCFA claims with requisite particularity: addressing the who, what, when, and where underlying Sanford's deceptive use of the third-party Tracking Tools. And fifth, Plaintiff does not assert claims on behalf of a failsafe class.

Because none of Sanford's arguments negate Plaintiff's well-pleaded allegations that Sanford unlawfully intercepted and disclosed Plaintiff's sensitive health information through its Website in violation of federal and state statutes and common law, the Court should deny Sanford's motion in its entirety.

## BACKGROUND

Sanford Health patients and prospective patients visit https://www.sanfordhealth.org, on their phones or computers, seeking information related to their healthcare, including Sanford's doctors, services, locations, and more. Compl. ¶¶ 3, 50. Once on Sanford's website—a website specific to care Sanford offers to its patients

and not a generic resource for medical-related information—the patient or prospective patient may view certain pages or enter text in the search bar. *Id.* ¶ 49. With each click, keystroke, finger swipe, or scroll, the website user communicates with Sanford, disclosing their personal information, including but not limited to, computer IP addresses; patient status; health conditions; health symptoms; treatments; health assessments; and unique identifiers used to link the web communications to the particular patient and their health. *Id.* ¶ 6, 130. However, Sanford is not the only recipient of these communications. *Id.* ¶ 6. Unbeknownst to website users—and without their consent—Sanford deploys Tracking Tools[1] from over fourteen different companies, including Meta, Snapchat, Google, Microsoft, and Mixpanel. *Id.* ¶¶ 39, 72, 80, 121. Through these Tracking Tools, these companies learn that a specific patient was seeking confidential health care from Sanford or exploring treatment for a specific condition. *Id.* ¶ 7.

Sanford does not inform website visitors that it employs Tracking Tools that identify specific visitors and connect those visitors to the health-related communications they make within the Sanford website. Compl. ¶¶ 58-63, 66. Nor does it inform its users of the types of information third parties receive from the Sanford website through the Tracking Tools. Instead, Sanford assures its website users that visitors "can browse all Sanford Health websites without providing any personal information." *Id.* ¶ 32. And that Sanford "do[es] not share personal information with third parties unrelated to Sanford Health, except when required to for legal purposes or investigations. We may share your personal information

[1] Capitalized terms have the same meaning as provided in Plaintiff's Complaint, ECF No. 1.

with third parties who we have contracted with to help us provide services." *Id.* ¶ 36. Sanford does not explain to website users that those "third parties who [they] have contracted with" include advertisers like Meta, Google, Snapchat, and others. Sanford's use of the Tracking Tools harmed and will continue to harm Plaintiff and the Class. Indeed, the haphazard exposure of an individual's Sensitive Information violates one's privacy rights, diminishes the value of their personal information, and increases the risk of misuse of their data. *Id.* ¶¶ 98-100, 107, 112, 127.

Plaintiff Robert Hanson, a current Sanford Health patient, suffered and continues to suffer from these very harms. In advance of spinal surgery, Plaintiff Hanson used the Sanford Health website to obtain more information on the surgeon responsible for his care. Compl. ¶ 15. In doing so, Hanson reasonably expected that these online communications, which identify his physician and therefore the type of condition he suffered from, would not be disclosed or revealed to data giants like Meta or Google without his authorization. *Id.* ¶ 17. Those expectations were violated when Sanford exposed and intentionally allowed third parties to intercept Plaintiff's personal, private, and confidential data through the Tracking Tools. *Id.* ¶ 17. These third parties utilized this information by targeting Plaintiff with advertisements relating to his back and spine issues. *Id.* at ¶ 17. Plaintiff Hanson accordingly filed a Complaint on behalf of himself and all others similarly situated for invasion of privacy; violations of the Electronic Communications Privacy Act ("ECPA"), the Minnesota Unfair and Deceptive Trade Practices Act ("MDTPA"), the Minnesota Health Records Act ("MHRA"), and the Minnesota Consumer Fraud Act ("MCFA"); and

unjust enrichment. Sanford presently moves to dismiss all counts but that for unjust enrichment and to strike Plaintiff's class allegations.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint must contain sufficient factual matter that, when accepted as true, supports a facially plausible claim for relief. *See, e.g.*, *Hamilton v. Palm*, 621 F.3d 816, 817-18 (8th Cir. 2010). All doubts are to be resolved in favor of the complaint's sufficiency. *Leimer v. State Mut. Life Assur. Co. of Worcester, Mass.*, 108 F.2d 302, 304 (8th Cir. 1940); *accord Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 563 n.8 (2007).

## ARGUMENT

Sanford moves to dismiss all Plaintiff's claims except for unjust enrichment. Simultaneously, Sanford moves to strike Plaintiff's class allegations. For the reasons that follow, the Court should deny Sanford's request for relief in its entirety.

### I. Plaintiff has Sufficiently Plead a Claim for Invasion of Privacy.

Sanford's Motion to Dismiss Plaintiff's invasion of privacy claim for intrusion upon seclusion should be denied. Plaintiff adequately alleges Sanford's highly offensive and unlawful intrusion into private communications with Sanford, his healthcare provider. Indeed, Sanford inserted a third-party tracking device into its website specifically so that tracking device could record patient communications. This is an obvious violation of the reasonable expectation of privacy patients and prospective patients enter communications with their healthcare provider and satisfies the elements of Plaintiff's intrusion upon seclusion privacy claim.

A defendant is liable for intruding upon the seclusion of another when it "intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns" and if a reasonable person would find that intrusion to be highly offensive. *Lake v. Wal-Mart Stores, Inc.*, 582 N.W.2d 231, 233 (Minn. 1998). An individual's choice of what information about himself is shared with others lies at "[t]he heart of our liberty." *Id.* at 235. Defendant's surreptitious recording of Plaintiff's sensitive medical information and disclosure of that sensitive information to third parties violated this central right.

Intrusion upon seclusion has three elements: (1) an intrusion; (2) that is highly offensive; and (3) is into some matter in which a person has a legitimate expectation of privacy. *Goldberg v. McCormick*, No. CV 17-919 (PAM/LIB), 2018 WL 579407, at *2 (D. Minn. Jan. 26, 2018) (citing *Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741, 744 (Minn. Ct. App. 2001) (finding an intrusion could also be made by defendant's senses, such as overhearing plaintiff's private affairs)). Plaintiff's allegations satisfy these elements.

**A. Sanford Intruded on Plaintiff's Seclusion.**

Defendant argues that Plaintiff's intrusion upon seclusion claim is really a claim for disclosure of private information and that it was Meta[2], not Sanford, that intercepted Plaintiff's Website Communications, *see* Def. Mem. at 6, but that is not the case. Plaintiff alleges that Sanford deployed the digital equivalent of a tape recorder on Plaintiff's web browser, without informing Plaintiff or acquiring the required affirmative consent from

[2] Plaintiff's allegations include other Tracking Tools Sanford deployed on its website.

Plaintiff to deploy a recording device and used that device to transmit Plaintiff's online activity to a third party. Compl. ¶¶ 5, 10, 17. Sanford did so under the guise of patient-provider confidentiality protections and Plaintiff had no knowledge that Sanford, his healthcare provider, was recording and disseminating his sensitive information to third parties like Meta, Google, Microsoft, and others. *Id.* at ¶¶ 17, 119, 121-22, 162-62. Sanford intruded on Plaintiff's seclusion by placing a recording device—here, the Tracking Tools—where they would collect and disseminate information from Plaintiff. *Id.* ¶¶ 5, 10, 17. On these facts, other courts, including from this District, have found intrusions under Minnesota law. *See In re Group Health Plan Litig.*, 709 F. Supp. 3d 707, 714 (D. Minn. 2023) (hereinafter "*Group Health*") (concluding that allegations the defendant "integrated Facebook Pixel and CAPI into its Website and servers . . . which intercepted and shared communications with third parties, including Facebook" adequately pleaded an "intentional intrusion" under Minnesota law).

Sanford relies on distinguishable cases to argue for the dismissal of this claim. In *Mekhail* and *Okash* neither court had been presented with the facts alleged here. In *Mekhail*, for example, the record before the court led to a conclusion that the alleged intrusion was the same conduct as the alleged interception. *Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916, 936 (D. Minn. 2024) ("Since the factual allegations supporting the interception claims are the same as those supporting the intrusion claim, the Court concludes that North cannot be an alleged intruder if North is not the alleged interceptor."). That is not the case here. Here, Plaintiff alleges that, in addition to the unlawful transmission of the sensitive data, his privacy was also violated when Sanford intentionally

exposed his private information to the Tracking Tools it installed on its website. Compl. ¶ 17; *see also Id.* ¶¶ 1-3. In *Okash*, the Court adopted the reasoning of an unpublished opinion from the Minnesota Court of Appeals to conclude that "voluntarily" providing data to another means there can be no claim for intrusion upon seclusion. *Okash v. Essentia Health*, No. CV 23-482 (JRT/LIB), 2024 WL 1285779, *7 (D. Minn. Mar. 26, 2024) (*citing Lehman v. Zumbrota-Mazeppa Pub. Schs.*, No. 04-1226, 2005 WL 894756, at *4 (Minn. Ct. App. Apr. 19, 2005), and concluding that "[b]ecause Okash voluntarily provided his data to Essentia, Essentia did not intrude upon his seclusion"). Here, however, Plaintiff has alleged that he provided information to Sanford with the expectation that Sanford would not share it unless Sanford first obtained his consent, and Plaintiff did not voluntarily provide any information to Sanford for the purpose of assisting Sanford with advertising or marketing efforts. Compl. ¶ 17. Plaintiff did not voluntarily provide his information to Defendant because the full extent of Defendant's collection and use of the information was not disclosed to him. *See Swarthout v. Mut. Serv. Life Ins. Co.*, 632 N.W.2d 741 (Minn. Ct. App. 2001) (holding that medical insurance company's alteration of patient's information release raised fact questions that precluded summary judgment).

### B. Sanford's Intrusion was Highly Offensive and Violated a Reasonable Expectation of Privacy.

Defendant does not address the other two elements of an intrusion upon seclusion claim. Nevertheless, Plaintiff adequately alleges those elements at this early stage in the proceedings.

Whether an intrusion is "highly offensive" is generally a question of fact not suited for adjudication on a motion to dismiss. *See Mallak v. Aitkin Cnty.*, 9 F. Supp. 3d 1046. To determine whether an intrusion is highly offensive, the Court considers "the degree of intrusion, the context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded and the number and frequency of the intrusive contacts." *Mallak*, 9 F. Supp. 3d at 1064 (internal quotations omitted).

The reasonable expectations concerning the confidentiality of sensitive health information, nature of the alleged intrusion, preliminary information demonstrating Sanford's motives, setting of the intrusion, and frequency of the intrusions support Plaintiff's contention that Sanford's intrusion was highly offensive. Plaintiff's reasonable expectation of privacy in his medical information is well settled. *Group Health*, 709 F. Supp. 3d at 714 (denying motion to dismiss intrusion upon seclusion claim based on allegations of tracking communications about medical records and diagnoses); *Kennedy v. City of Braham*, 67 F. Supp. 3d 1020, 1035 (D. Minn. 2014) (listing private medical information as a category of information in which a person has a reasonable expectation of privacy); *see also* Compl. ¶¶ 119-22 (describing surveys and literature on consumers' expectations of data privacy). Sanford is Plaintiff's medical provider—a relationship that automatically comes with confidentiality obligations and expectations. Compl. ¶ 14. Prior to a scheduled back surgery, Plaintiff used Sanford's website through his personal device to look up his doctor. *Id.* at ¶ 15. Plaintiff expected this interaction concerning his medical care to be treated with the same level of confidentiality as he would expect to receive during

an in-office visit to Sanford *Id.* at ¶¶ 17, 119, 121-22, 162-62. This was a reasonable expectation as Sanford's website is simply an extension of the in-person care Sanford provides. *Id.* at ¶¶ 3, 17, 119, 122, 162-65.

As alleged, Sanford secretly and knowingly violated its confidentiality obligations to Plaintiff, in violation of federally protected privacy rights and disregard for HIPAA regulations, federal and state law, and Health and Human Services (HHS) guidance—guidance that expressly warned providers, like Sanford, that use of the Pixel and other tracking technologies was not permitted because of serious patient privacy concerns. *Id.* ¶¶ at 23-28. Sanford knowingly collected and disclosed patient's and prospective patient's health information every time they used Sanford's website, without required consent, for its own commercial gain. This breach of healthcare provider obligations and patients' federally protected privacy is highly offensive.

Plaintiff has adequately pleaded his claim for intrusion upon seclusion and Sanford's motion should be denied.

## II. Plaintiff States an MHRA Claim.

Sanford argues it is not liable under the MHRA because Plaintiff's search for information regarding the physician who would be performing his surgery is not a "health record." Def. Mem. at 9. This is not correct and fails to consider the other health records Plaintiff alleged Sanford disclosed.

The MHRA governs the release and disclosure of "health records" and imposes liability on "[a] person" who negligently or intentionally releases a health record in violation of MHRA guidelines. Minn. Stat. § 144.293, subd. 2. The goal of the MHRA is

to "protect the privacy of individual's health care information." *Yath v. Fairview Clinics, NP*, 767 N.W.2d 34, 49 (Minn. Ct. App. 2009). Consistent with this broad statutory purpose, the MHRA contains an expansive definition of "health records" which as relevant here includes "any information, whether oral or recorded in any form or medium, that relates to the past, present, or future physical or mental health or condition of a patient; the provision of health care to a patient." Minn. Stat. § 144.291(c).

Plaintiff's allegations satisfy that definition. Plaintiff alleges that he was a patient seeking care at Sanford Health and that he sought through Sanford's website information relating to his physician. He further alleges that Sanford disclosed this information, along with information from which third parties can identify him, without his consent, to third parties via its Tracking Tools. Patient status or the identity of one's physician, and therefore the nature of the conditions for which one is seeking treatment, is information that stands in relation to the physical health of and provision of healthcare to the patient. *See e.g., Group Health*, 709 F. Supp. 3d at 713 (holding plaintiffs alleged defendant released "health records" by releasing their website communications relating to plaintiffs' searches for physicians); *Okash v. Essentia Health*, No. CV 23-482 (JRT/LIB), 2025 WL 642913, at *6 (D. Minn. Feb. 27, 2025) (same). It is a health record and disclosing it to third parties without consent is a violation of the MHRA.

Sanford's insistence that "for information to meet the definition of a health record under the MHRA, there must be more than an inference of the provision of healthcare" does not change the result. Def. Mem. at 14. In support of this argument, Sanford relies on two nonprecedential opinions of the Minnesota Court of Appeals, neither of which

examined the statute's broad definition of "health record:" *Rhoades* and *Furlow*. In *Rhoades v. Lourey*, the appellant did not argue that the form in question was itself a "health record," and in fact conceded that it was not. *Rhoades v. Lourey*, No. A18-1120, 2019 WL 1006804, at *2 (Minn. Ct. App. Mar. 4, 2019) ("Appellant acknowledges that the BCA form 'does not constitute a health record.'"). Accordingly, the Court did not closely examine the statutory language. This lack of examination was compounded by the Court's decision in *Furlow v. Madonna Summit of Byron*, where the Minnesota Court of Appeals relied not on language within the MHRA, but instead on the case's similarity to *Rhoades*. *See Furlow v. Madonna Summit of Byron*, No. A19-0987, 2020 WL 413356, at *2-3 (Minn. Ct. App. Jan. 27, 2020).

Indeed, it was not until the Minnesota Court of Appeals' recent decision in *Holtzbauer* that a court closely scrutinized the statute's language. And in doing so, the court's holding was clear: "health record" should be interpreted according to the unambiguous language of the MHRA. *See Holtzbauer v. Allina Health Sys.,* 23 N.W.3d 608, 614 (Minn. Ct. App. 2025), *rev. granted* (Minn. Aug. 12, 2025). Specifically, the Court of Appeals held that

> [A] health record is any information that pertains, refers, or stands in some relation to (1) the past, present, or future physical or mental health or condition of a patient; (2) the provision of health care to a patient; or (3) past, present, or future payment for the provision of health care to a patient.

*Id*. There is no language in the statute excluding from the "health records" definition information which requires an inferential step, and it is not the role of the courts "to add to a statute words intentionally or inadvertently omitted by the Legislature." *Id.* at 615

(quoting *Linn v. BCBSM, Inc.*, 905 N.W.2d 497, 503 (Minn. 2018)). To the extent that the nonprecedential cases *Furlow* and *Rhoades* added an additional limitation to the statute, they are at odds with the Court of Appeals' precedential holding in *Holtzbauer* and should not be relied on by this Court in interpreting the MHRA.

Courts in this district, when applying the plain language of the statute to a patient-plaintiff's web-based communications with a defendant-provider, have held that those web-based communications were "health records" within the meaning of the statute. For example, in *Okash II*, Judge Tunheim concluded that a patient's web inquiries were "health records" under the language of the MHRA where the patient searched for a specific physician on the provider's website. *Okash v. Essentia Health (Okash II)*, No. CV 23-482 (JRT/LIB), 2025 WL 642913, at *6 (D. Minn. Feb. 27, 2025). Judge Blackwell reached a similar conclusion in *Group Health*, 709 F. Supp. 3d at 713 (D. Minn. 2023), holding:

> Plaintiffs allege that they used the Websites to . . . search for physicians. . . . Plaintiffs also allege that the Websites routinely provided Facebook with this health information and other identifying information they had input into the Websites. Plaintiffs' allegations are sufficient to plausibly plead that health records were released without their consent, considering the broad definition of health records in the statute.

Sanford argues that these cases are distinguishable because they involved the "provision of healthcare." But the same is true here. Plaintiff sought information about a physician scheduled to perform his surgery in advance of that surgery. Plaintiff's inquiry likewise relates to the provision of healthcare. And so, the Court should reach the same conclusion.

## III. Plaintiff Has Sufficiently Pleaded that Sanford Violated the ECPA.

The ECPA prohibits the unauthorized interception of electronic communications. *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 606–07 (9th Cir. 2020) (*quoting* 18 U.S.C. § 2511(1)(a)–(e)). The paramount objective of the ECPA is to ensure that private communications remain private. *Gelbard v. U.S.*, 408 U.S. 41, 48 (1972). Thus, the statute expresses "a strong purpose to protect individual privacy by strictly limiting the occasion on which interception may lawfully take place." *Watkins v. L.M. Berry & Co.*, 704 F.2d 577, 581 (11th Cir. 1983) (*citing U.S. v. Harpel*, 493 F.2d 346, 351 (10th Cir. 1974)).

To state a claim under the ECPA, Plaintiff must allege Defendant or third parties like Meta: (1) intentionally (2) intercepted (3) the contents of (4) plaintiffs' electronic communications (5) using a device. *See In re Pharmatrak*, 329 F. 3d 9, 18 (1st Cir. 2003) (listing elements for a ECPA claim); *In re Meta Pixel Healthcare Litig*., No. 22-cv-03580, 2022 WL 17869218 (N.D. Cal., Dec. 22, 2022) (hereinafter, "*Meta Pixel*") (same); *Mike v. Mike*, No. 03-cv-6203 JMR/FLN, 2004 WL 2801585, at *2 (D. Minn. 2004) (same ). Here, Plaintiff alleges Defendant intentionally embedded third-party Tracking Tools on its Website, which caused the content of Plaintiff's Website Communications to be simultaneously and surreptitiously tracked, intercepted, and sent to third parties like Meta without proper authorization. Compl. ¶¶ 5, 10, 17, 66. This satisfies each of the elements for a valid wiretap claim under the ECPA.

Defendant makes two challenges to Plaintiff's Wiretap Claims: (1) the party-to-a-communication defense in 18 U.S.C. § 2511(2)(d); and (2) the inapplicability

of the crime-tort exception in 18 U.S.C. § 2511(2)(d). Neither of these arguments warrant dismissal of Plaintiff's ECPA claim.

**A. The "Party Defense" does not apply here.**

Defendant's primary argument to avoid liability under the ECPA is the party-to-the-communication defense ("Party Defense"). Def. Mem. at 18. The relevant section of the federal statute states:

> [i]t shall not be unlawful under [chapter 2511] for a person not acting under the color of the law to intercept a wire, oral, or electronic communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State.

18 U.S.C. § 2511(2)(d)[3]. As a preliminary matter, Sanford prematurely raised this defense in its Rule 12(b)(6) motion, and the Court could deny it on that basis alone. *See Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d at 928 (concluding that "the parties require discovery to determine whether North's actions do, in fact, constitute conduct required to invoke the crime-tort exception"); *Group Health*, 709 F. Supp. 3d at 720 ("This case is at the pleading stage. While Plaintiffs have alleged HealthPartners' motivations, determination of HealthPartners' *actual* purpose for installing and using the Pixel Code requires a factual undertaking. Plaintiffs, without the benefit of discovery, have met the

[3] Sanford does not substantiate an argument that the "consent" prong of § 2511 applies, only that Sanford was a party to the communication. *See* Def. Mem. of Law at 19 (citing *Essentia*: "[A] 'party to a communication, consented to its interception." But a healthcare provider, like Sanford cannot lawfully consent to the disclosure of patient information, only a patient can provide lawful consent.

pleading requirements to plausibly allege the crime-tort exception applies."); *Doe v. Smith*, 429 F.3d 706, 709 (7th Cir. 2005) (finding "[c]omplaints need not anticipate or attempt to defuse potential defenses," "the defense of single-party consent has limits," and reasoning that plaintiff may be able to show a crime-tort purpose).

But even if Sanford's invocation of the Party Defense is ripe, Sanford is not entitled to its protection because Sanford intentionally duplicated and forwarded protected communications to Meta and other third parties, without Plaintiff's knowledge or authorization.[4] Moreover, where the interceptor acts "for the purpose of" committing any crime or tort in violation of state or federal law, the crime-tort exception to the Party Defense applies and Sanford can still be held liable under the ECPA. For these reasons, Plaintiff's claim under the ECPA should proceed.

**1. Sanford violated the ECPA by secretly duplicating and forwarding communications.**

Circuit Courts of Appeal have consistently confirmed that valid wiretap claims are presented where the intended recipient "permit[ed] an entity to engage in the unauthorized

[4]Sanford did not raise and has waived any defense to Plaintiff's allegation that it procured Meta and third parties to intercept Plaintiff's communications, which is itself actionable. Compl. ¶¶ 90-97, 180. The Party Defense is limited to intercepting and does not exempt persons that procure another to intercept, like Defendant did here. Civil liability exists for procuring another to intercept communications. *See Lonegan v. Hasty*, 436 F. Supp. 2d 419, 428 (E.D.N.Y. 2006) ("[B]oth the person who actually intercepted the communications and the person who procured the interception have violated the Act, and the victim is authorized to sue any person or entity who engage in that violation."); *Valentine v. WideOpen West Fin., LLC*, 288 F.R.D. 407, 412 n.3 (N.D. Ill. 2012) (similar); *Boseovski v. McCloud Healthcare Clinic, Inc.,* No. 2:16-CV-2491-DMC, 2020 WL 68578, at *6 (E.D. Cal. Jan. 7, 2020); *compare with Peavy v. WFAA-TV, Inc.*, 221 F.3d 158, 169 (5th Cir. 2000) (opposite finding).

duplication and forwarding of unknowing users' information." *Facebook Tracking*, 956 F.3d at 607 (*citing Pharmatrak*, 329 F.3d at 22; *United States v. Szymuszkiewicz*, 622 F.3d 701, 701 (7th Cir. 2010)). In *Facebook Tracking*, after reviewing the legislative history at length, the Ninth Circuit adopted the reasoning of the First and Seventh Circuits, concluding that ECPA claims are properly presented against parties that secretly duplicated and forwarded communications to third parties:

> [S]imultaneous, unknown duplication and communication of GET requests do not exempt a defendant from liability under the party exception. As we have previously held, the "paramount objective of the [Electronic Communications Privacy Act, which amended the Wiretap Act] is to protect effectively the privacy of communications." *Joffe v. Google*, 746 F.3d 920, 931 (9th Cir. 2013). We also recognize that the Wiretap Act's legislative history evidences Congress's intent to prevent the acquisition of the contents of a message by an unauthorized third-party or "an unseen auditor." *See* S. Rep. No. 90-1097, reprinted in 1986 U.S.C.C.A.N. 2112, 2154, 2182. Permitting an entity to engage in the unauthorized duplication and forwarding of unknowing users' information would render permissible the most common methods of intrusion, allowing the exception to swallow the rule.

*Id.* The conduct described in the Complaint falls squarely within the rule articulated in *Facebook Tracking*—the only difference being Sanford intercepted and procured Meta, Google, and others to intercept, which creates the same liability under the ECPA. As alleged, Sanford embedded Tracking Tools on its Websites, which caused the unauthorized duplication and redirection of the Websites' users' Sensitive Information to third parties like Meta and Google without the users' knowledge or consent. Compl. ¶¶ 5, 10, 17, 66; *see Szymuszkiewicz*, 622 F.3d at 706 (holding "the duplication and forwarding" of content violates the ECPA). Thus, the Party Defense does not apply here.

### 2. The Crime-Tort Exception applies to Sanford's Party Defense.

Even if Sanford is a "party" to the communications, it cannot benefit from the Party Defense because of the ECPA's Crime-Tort Exception. The Party Defense provision in 18 U.S.C. § 2511(2)(d) states that parties to a communication are still liable if the "communication is intercepted for the purpose of committing any criminal or tortious act" ("Crime-Tort Exception"). *Id.* To assert the Crime-Tort Exception, Plaintiff need only plead "sufficient facts to support an inference that the offender intercepted the communication [or caused the communication to be intercepted] for the purpose of a tortious or criminal act that is independent of the intentional act of recording." *In re Google Cookie*, 806 F.3d 125, 145 (3rd Cir. 2015); *see also Sussman v. Am. Broad. Cos., Inc.*, 186 F.3d 1200, 1202 (9th Cir. 1999) ("Under section 2511, 'the focus is not upon whether the interception itself violated another law; it is upon whether the purpose for the interception—its intended use—was criminal or tortious.'") (citations omitted).

As Plaintiff alleges, Sanford is a healthcare provider intentionally facilitating the intercepting, disclosing, and its own improper use of *private, personally identifiable medical information.* Compl. ¶¶ 15-17, 90-97, 180-85. Criminal or tortious purposes may include violations of the MHRA, HIPAA, and MDTPA and violations of federal privacy standards of HIPAA. *See Mekhail*, 726 F. Supp. 3d at 928 (applying the Crime-Tort Exception where plaintiff had pleaded a violation of state health records laws and unjust enrichment, and had alleged violations of privacy obligations under federal law); *Group Health*, 709 F. Supp. 3d at 719-20 (finding tortious purpose adequately pleaded based on allegations of violations of the MHRA, HIPAA, MDTPA, and invasion of privacy);

*Deteresa v. Am. Broadcasting Cos., Inc*., 121 F.3d 460, 467, n.4 (9th Cir. 1997) (stating that the Crime-Tort Exception applies to invasions of privacy, fraud, and unfair business practices). Similarly, courts have found this element satisfied where a plaintiff alleges the defendant's intent to commit common law privacy claims. *See Brown v. Google*, 525 F. Supp. 3d 1049, 1067 (N.D. Cal.) (intrusion upon seclusion, invasion of privacy, and other violations); *Planned Parenthood v. Ctr. for Med. Progress,* 214 F. Supp. 3d 808, 828 (N.D. Cal. 2016) (recognizing "further invading privacy of plaintiffs' staff" sufficed to state crime-tort exception to consent exception). Here, Sanford allegedly procured third parties to intercept Plaintiff's electronic communications for the purpose of collecting private medical information without consent—consent it could have, and was required to have, obtained. Indeed, under Plaintiff's allegations, Sanford embedded the Tracking Tools without first acquiring consent to: (1) subvert the consent required to disclose Sensitive Information under HIPAA (a crime); and (2) invade the privacy of Plaintiff and the Class Members for commercial gain (a tort).

**a. Sanford's intentional HIPAA violation is a criminal purpose.**

Sanford incorrectly argues that Plaintiff has not alleged a criminal or tortious purpose. Def. Mem. at 20-21. Plaintiff alleged, at length, Sanford's intentional disregard for its privacy obligations as a HIPAA-covered healthcare provider by installing the Tracking Tools on its Website and using the collected information for third-party marketing services. Compl. ¶¶ 23-28.

It is a federal crime for healthcare providers to "knowingly" disclose "individually identifiable health information" to third parties for "commercial" reasons without consent, as Plaintiff alleges of Sanford here. *See* 42 U.S.C. § 1320d-6 (HIPAA criminal provision).[5] Sanford is a HIPAA-covered healthcare provider that received federally protected data and disclosed that data, without authorization; Sanford also financially benefited from the intercepted data. Compl. ¶¶ 68, 71. These are sufficient allegations.

Sanford also knew the Tracking Tools were not an innocuous website technology it could secretly benefit from without consequence. The Department of HHS issued guidance warning healthcare provides that:

> **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.** For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

Compl. ¶ 126 (hereinafter, "HHS guidance") (emphasis in original). This HHS guidance was aimed squarely at healthcare providers including Sanford, which intentionally ignored it. Indeed, this HHS guidance put Defendant on notice that use of the Pixel on its Websites was linked to violations of HIPAA.

Plaintiff's allegations that Sanford used patient data for advertising in violation of § 2511(2)(d) are sufficient at the pleading stage to evince that "plaintiffs may be able to

[5] "[C]overed entities … may be prosecuted directly under 42 U.S.C. § 1320d-6" and "the 'knowingly' element of the offense set forth in that provision requires only proof of knowledge of the facts that constitute the offense." www.justice.gov/sites/default/files/olc/opinions/attachments/2014/11/17/hipaa_final.htm.

show that the crime-tort exception applies," particularly given "state court decisions establishing that tort claims may lie against health care providers over their use of Pixel." *Meta Pixel*, 2022 WL 17869218, at *12 (denying "extraordinary remedy" of preliminary injunction, but noting "[o]f course, this claim will present differently in a motion to dismiss context," *id.*, at *13); *In re Google Cookie*, 806 F.3d at 145 (holding "all authority of which we are aware indicates that the criminal or tortious acts contemplated by § 2511(2)(d) are acts secondary to the acquisition of the communication involving tortious or criminal use of the interception's fruits.")

Additionally, even if the Court finds that commercial marketing is a legitimate purpose for using Tracking Tools, it is recognized law that any purported legitimate purpose that Sanford now asserts, after committing the violation, does not "sanitize" an interception that was made for a tortious purpose. *See Sussman*, 186 F.3d at 1202 ("the existence of a lawful purpose does not mean that the interception is not also for a tortious or unlawful purpose . . . [t]he existence of the lawful purpose would not sanitize a [recording] that was also made for an illegitimate purpose"). Here, Plaintiff alleges Sanford embedded the Tracking Tools for the purpose of collecting Sensitive Information without required consent. Any subsequent use of that protected data does not absolve the original wrongful intent. Therefore, the crime-tort exception applies, and Sanford cannot claim the Party Defense.

**b. Invasion of Privacy is a Tortious Purpose.**

Plaintiff has alleged an invasion of his privacy, which also negates the Crime-Tort Exception. See *Planned Parenthood*, 214 F. Supp. 3d at 828 (holding "defendants'

subsequent disclosure of the contents of the intercepted conversations for the alleged purpose of further invading the privacy of plaintiffs' staff satisfies" the Crime Tort Exception). Plaintiff alleges Sanford intruded upon his seclusion. Compl. ¶¶ 162-68. As explained in the Section I, *supra*, Plaintiff has adequately alleged an intrusion upon seclusion by Sanford because Sanford (i) surreptitiously installed the recording devices on the Website; (ii) the interception of medical communications is highly offensive; and (iii) Plaintiff's expectation of privacy in communicating with his healthcare provider is reasonable. Plaintiff's adequately pleaded claim for intrusion upon seclusion means that the Party Defense is not available to Sanford.

Taken together, Plaintiff's allegations satisfy the Crime Tort Exception and negates the Party Defense Sanford asserts. The Court should deny Sanford's Motion to Dismiss and allow this claim to proceed.

## IV. Plaintiff States a MDTPA Claim.

Plaintiff also states an MDTPA claim. The MDTPA provides that a person "likely to be damaged by a deceptive trade practice of another may be granted an injunction against it." Minn. Stat. § 325D.45. subd. 1. To survive a motion to dismiss, a plaintiff stating an MDTPA claim must allege a likelihood of future harm and state with particularity the circumstances constituting fraud. *See Mekhail*, 726 F. Supp. 3d at 930-31. Contrary to Defendant's assertion otherwise, Plaintiff has done both.

### A. Plaintiff Has Standing Under the MDTPA.

Plaintiff first addresses Defendant's contention that Plaintiff lacks standing to bring an MDTPA claim. *Accord AbbVie, Inc. v. Ellison*, 777 F. Supp. 3d 971, 975 (D. Minn. 2025)

(observing that standing is a threshold issue). Under the MDTPA, "[a] person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it under principles of equity and on the terms that the court considers reasonable." Minn. Stat. § 325D.45, subd. 1. To obtain that injunction, the individual likely to be damaged must "demonstrate a likelihood of future harm." *Knotts v. Nissan N.A., Inc.*, 346 F. Supp. 3d 1310, 1327 (D. Minn. 2018). Here, Plaintiff has demonstrated the requisite likelihood of future harm. Plaintiff has alleged that he is a current patient of Sanford, that patients of Sanford utilize the Sanford website to access care, and that Sanford still utilizes its surreptitious Tracking Tools on its website. Compl. ¶¶ 3, 14, 72, 81, 96, 161. Plaintiff is therefore likely to be harmed by the continued invasion of his privacy while using the Sanford website.

Sanford attempts to deploy a once bitten, twice shy defense: that because Plaintiff now knows that Sanford omits the critical details regarding its use of the Tracking Tools, Plaintiff can no longer be harmed by the Tools' continued use. Def. Mem. at 24. For two reasons, the Court should not allow Defendant to slip MDTPA's grasp so easily. First, courts in this district have recognized that standing for MDTPA claims need not be predicated on a repeat case of deception. *Mekhail*, 726 F. Supp. 3d at 932-33 (D. Minn. 2024) (finding standing under the MDTPA where plaintiff pleaded a likelihood of returning to a medical provider and because the transmitted Sensitive Information remained beyond the plaintiff's control). For example, in *Cleveland v. Whirlpool Corp.*, Judge Nelson concluded that a plaintiff alleged a risk of future harm in her MDTPA claim against the manufacturer of a defective dishwasher where she was still in the market for the repair or a replacement of

her dishwasher. 550 F. Supp. 3d 660, 677 (D. Minn. 2021). Likewise, in *Hudock v. LG Electronics*, Judge Tunheim held that a plaintiff sufficiently stated a MDTPA claim premised on a TV-manufacturer's misrepresentation of its refresh rates where Plaintiffs alleged that they remained in the market for televisions and were therefore in danger of being harmed again. No. CV 16-1220 (JRT/FLN), 2017 WL 1157098, at *6 (D. Minn. Mar. 27, 2017). Here, Plaintiff is a current Sanford patient and therefore continues to need information contained within the Sanford website. Because Sanford continues to deploy its Tracking Tools, Plaintiff cannot access the website without suffering the further deprivation of his privacy. Plaintiff therefore remains at a risk of continued harm notwithstanding his pre-existing knowledge of Sanford's deceptive conduct.

Second, Sanford's proffered interpretation guts the MDTPA entirely. The legislature passed the MDTPA to protect consumers, and the statute "reflect[s] a clear legislative policy encouraging aggressive prosecution of [MDTPA] violations." *State by Humphrey v. Philip Morris Inc.*, 551 N.W.2d 490, 495 (Minn. 1996). That aggressive prosecution is hindered by "requiring an individual who has already been deceived by a business practice to establish that they are likely to be deceived again by that practice." *See Mekhail*, 726 F. Supp. 3d at 934; *see also Delgado v. Ocwen Loan Servicing, LLC*, 13-CV-4427, 2014 WL 4773991, at *14 (E.D.N.Y. Sept. 24, 2014) ("Finding that Plaintiffs have no federal standing to enjoin a deceptive practice once they become aware of the scheme would eviscerate the intent of [legislatures] in creating consumer protection statutes."); *Le v. Kohls Dep't Stores, Inc.*, 160 F. Supp. 3d 1096, 1110 (E.D. Wis. 2016) ("[W]ere the Court to accept [the defendant's] position that [the plaintiff's] awareness of the alleged deception

would operate to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result.") (cleaned up). If Sanford's proffered interpretation is correct, then a plaintiff could never seek injunctive relief to prevent further deception. And given that MDTPA's sole remedy is injunctive relief, accepting Sanford's interpretation as true would erase the statute from Minnesota law. The Court should not allow Sanford to capitalize on Plaintiff's present awareness of Sanford's own misconduct and escape injunctive relief.

### B. Plaintiff Stated His Claim with Particularity.

Sanford argues that Plaintiff failed to plead his MDTPA in accordance with Fed. R. Civ. P. 9(b), which requires that a party alleging fraud state "with particularity the circumstances constituting fraud." "With particularity" does not mean "with precise detail." *Group Health*, 709 F. Supp. 3d at 720. Rather a plaintiff need only plead sufficient detail to notify the defendant of the core factual basis for the fraud-based claims. *McGregor v. Uponor, Inc.*, No. 09-1136, 2010 WL 55985, at *3 (D. Minn. Jan. 4, 2010) (citation omitted); *see also Blue Cross and Blue Shield of Minnesota v. Wells Fargo Bank, N.A.*, Civ. No. 11-2529 (DWF/JJG), 2012 WL 1343147, at *4 (D. Minn. April 18, 2012) (recognizing that a heightened pleading standard does not "require such surgical precision" when there is an ongoing course of fraudulent conduct); *Ransom v. VFS, Inc.*, 918 F. Supp. 2d 888, 898 (D. Minn. 2013) ("Rule 9(b) does not require that the exact particulars of every instance of fraud be alleged, so long as the complaint includes enough detail to inform the defendant of the core factual basis of the fraud claims."). This requires that a plaintiff plead "the who,

what, when, where and how" of the allegedly deceptive conduct. *E–Shops Corp. v. U.S. Bank Nat'l Ass'n*, 678 F.3d 659, 665–66 (8th Cir. 2012).

Here, Plaintiff has alleged: "Who" – Sanford along with third parties like Meta (Compl. ¶¶ 1, 39, 72-89); "What" – concealing its practice of disclosing Plaintiff's and the Class's Sensitive Information to third parties through specifically alleged technological practices, without consent or authorization (*id.* at ¶¶ 8-10, 38-89); "When" – in fall 2024 (*id*. at ¶ 14); "Where" – Sanford's Website, specifically on the Doctors page (*id*. at ¶ 15); "How" – through the use of Tracking Tools on its Website, which allowed for a broad scope of patient information, including highly confidential medical information, to be tracked, collected and transmitted to third parties on an ongoing basis without the patients' knowledge, authorization or consent. (*id*. at ¶¶ 8-10, 38-89).

The Complaint clearly alleges the who, what, when, where and how comprising Plaintiff's MDTPA claim, including that Sanford failed and continues to fail to disclose that it collected and continues to unlawfully collect and share Plaintiff's and Class Members' Sensitive Information with Meta and other third parties without authorization. Courts in this district have repeatedly recognized that these sorts of allegations sufficiently support a claim that a healthcare provider violated the MDTPA by deploying Tracking Tools on its website. *See Group Health*, 709 F. Supp. 3d at 721 (finding the "when" sufficiently plead where plaintiff provided the year where they used the healthcare provider's website); *Okash v. Essentia Health*, No. CV 23-482 (JRT/LIB), 2024 WL 1285779, at *6 (D. Minn. Mar. 26, 2024) ("Okash also alleges a deceptive omission by Essentia's failure to comply with HIPAA and protect his sensitive health information.");

*Mekhail*, 726 F. Supp. 3d at 930 (holding who, when, where, and what sufficiently pleaded by alleging Defendant, from October 2021 to present, deployed on its website tracking tools and omitted that fact to plaintiff). Plaintiff sufficiently alleged Sanford's violation of the MDTPA by putting Sanford on notice as to the time, place, and substance of the alleged ongoing and continued wrongdoing.

### C. Sanford's Pre-existing Harm Argument Lacks Legal Support.

Sanford seeks to impose an additional requirement under the MDTPA, that Plaintiff show that Sanford's deceptive conduct already caused him harm.[6] *See* Def. Mem. of Law at 26 (referencing Plaintiff's purported failure to allege a causal nexus between Sanford's wrongful conduct and a "claimed damage"). Sanford is incorrect. To state a claim under the MDTPA, a plaintiff must allege that the continued violation of the statue "will cause" Plaintiff to suffer harm, not that it already has. *Luckey v. Alside, Inc.*, 245 F. Supp. 3d 1080, 1096 (D. Minn. 2017) (observing that plaintiffs must plead that a Defendant's MDTPA violation "will cause" plaintiffs' damages).[7] As addressed in Section IV.A, Plaintiff has already done exactly that.

---

[6] Sanford inexplicably attempts to ground this rule in *Group Health Plan, Inc. v. Philip Morris Inc.*, 621 N.W.2d 2 (Minn. 2001), claiming that this case requires a plaintiff stating a MDTPA claim to establish a causal nexus between the violative conduct and damages that have already occurred. *See* Def. Mem. of Law at 26. But *Group Health Plan v. Philip Morris Inc.* does not address the MDTPA, instead addressing only Minn. Stat. §§ 325F.67, 325F.69, 325D.13. It, therefore, does not apply.

[7] Sanford likewise cites *Luckey* for the proposition that Plaintiff ground his MDTPA claim in a harm already caused by Sanford's deceptive conduct. *See* Def. Mem. at 26. Again, the cited case does not support the proposition.

### D. Sanford's Notice Argument is Inappropriate for the Motion to Dismiss Stage.

Sanford offers one final basis for its argument that Plaintiffs' MDTPA claim should be denied: that Plaintiff failed to allege deceptive statements. The argument cannot carry the day for three reasons. First, Plaintiff's claims are not premised on just Sanford's deceptive statements relating to patient privacy. They are also based on Sanford's material omissions regarding its use of the Tracking Tools. *See* Compl. ¶¶ 8-10, 38-89, 192. Accordingly, Plaintiff is not required to identify deceptive statements. Second, even if Plaintiff's claims were not based on omissions, it is premature for the Court to determine whether Sanford's Privacy Statement adequately put Plaintiff on notice as to its use of the tracking tools. In addressing a nearly identical argument in *Mekhail*, 726 F. Supp. 3d at 931, the court recognized that the argument functionally asks the Court "to make factual determinations about the effect that the Privacy Policy had (or ought to have had) on [plaintiff], weighing [defendant's] interpretation of its meaning and import against [plaintiff's]." Third, the Privacy Statement fails to adequately disclose material information relating to Sanford's use of Tracking Technologies. It does not, for example, explain that, through the Pixels, Meta can identify specific individuals and link individuals to Facebook or Instagram profiles. *See* Compl. ¶¶ 60-63. Nor does it inform users that their requests for information through the website constitute the communication of protected health information. *Id.* ¶ 37. The Court should reject Sanford's untimely factual assertions to the contrary.

## V. Plaintiff Alleges a Casual Nexus as Required by the MCFA

Sanford argues that Plaintiff fails to allege a "causal nexus" between Sanford's misrepresentations and the provision of its services. Sanford does not challenge the other elements of Plaintiff's MCFA claim.[8] Sanford's motion should be denied because Plaintiff alleges a nexus between Sanford's representation that it protected sensitive medical information and Sanford's sale of medical services through the use of its website.

The MCFA prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby." Minn. Stat. § 325F.69, subd. 1. The statute defines "merchandise" to include "any objects, wares, goods, commodities, intangibles, real estate, loans, or services." Minn. Stat. § 325F.68, subd. 2. Medical services are "merchandise" under the statute because they are "services" and "intangibles." *See* Compl. ¶ 215.

A cause of action under the MCFA requires that plaintiffs allege: "(1) a public benefit, and (2) a misrepresentation sufficient to violate the statute." *Varela v. State Farm Mut. Auto. Ins. Co.*, No. 22-970-JRT/DTS, 2023 WL 1971753, at *6 (D. Minn., 2023) (quoting *Khoday v. Symantec Corp.*, 858 F. Supp. 2d 1004, 1016 (D. Minn. 2012)). A cognizable misrepresentation under the statute includes both an affirmative misrepresentation of a material fact or concealing or omitting disclosure of a material fact

[8] For the reasons stated in Section IV.B., *supra*, Plaintiff stated his claim for a violation of the MCFA with the requisite particularity.

that the defendant had a duty to disclose, also known as fraudulent omission. *Graphic Commc'ns Loc. 1B Health & Welfare Fund A v. CVS Caremark Corp*, 850 N.W.2d 682, 695 (Minn. 2014).

To state a fraudulent omission claim under the MCFA, the plaintiff needs to allege that the defendant had a duty to disclose the omitted information, which can be established in one of three special circumstances: "(1) if one party 'has a confidential or fiduciary relationship' with the other party; (2) if one party 'has special knowledge of material facts' to which the other party 'does not have access;' or (3) if one party speaks, they 'must say enough to prevent the words communicated from misleading' the other party." *Varela*, 2023 WL 1971753, at *7 (quoting *Graphic Commc'ns*, 850 N.W.2d at 695-96). Such a claim must satisfy the heightened pleading standard of Fed. R. Civ. P. 9(b). *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177, 182 (Minn. Ct. App. 2012).

All the special circumstances that would require Sanford to disclose omitted information apply in this case. The patient-provider relationship requires confidentiality. *Stubbs v. N. Mem'l Med. Ctr.*, 448 N.W.2d 78, 82 (Minn. Ct. App. 1989) (holding that a physician and patient have an implied contract, a condition of which is that "the doctor warrants that any confidential information gained through the relationship will not be released without the patient's permission"). Sanford is a healthcare provider and the individuals that use its website are patients or prospective patients seeking medical care. Sanford created the website in order to further the provision of care for its patients by providing them information relating to its physicians, its locations, and the services it

provides. Compl. ¶ 3. Adequately protecting medical information goes hand-in-hand with the provision of healthcare to those patients. Compl. ¶¶ 123-27.

As alleged, Sanford knowingly collected medical information from patients and prospective patients through its website and disclosed this information to third parties, without patients knowledge or consent. *Id.* ¶¶ 216-17. These are material facts that Plaintiff and other patients did not know when they visited the website and provided sensitive information to Sanford through the website. Failing to disclose this practice and policy while conducting business throughout Minnesota was deceptive to Plaintiff and other prospective and existing patients.

Sanford's Motion to Dismiss should be denied because Plaintiff has sufficiently pleaded his claim under the MCFA.

## VI. Class Definition

Sanford's motion to strike the class definitions asks the Court to make a complicated, fact-based decision solely on the Complaint without the benefit of any record, evidence, or discovery, and it should be denied. Sanford argues that Plaintiff's proposed classes are "fail-safe" classes because they contain contested elements of liability. Sanford is wrong.

Striking class allegations at the pleading stage is a "'drastic,' 'extreme[,] and disfavored measure.'" *Adams v. U.S. Bancorp.*, 635 F. Supp. 3d 742, 757 (D. Minn. 2022) (quoting *Donelson v. Ameriprise Fin. Servs.*, 999 F.3d 1080, 1091 (8th Cir. 2021)). As such, "[t]he weight of authority indicates that courts should meet motions to dismiss class

allegations at the 12(b)(6) stage with a great deal of skepticism." *Nobels v. State Farm Mut. Auto. Ins. Co.*, No. 10-cv-4175, 2012 WL 4090347, at *2 (W.D. Mo. Sept. 17, 2012).

To resolve issues of class certification, courts must "probe behind the pleadings" and engage in a "rigorous analysis" to ensure "that the prerequisites of Rule 23(a) have been satisfied." *Gen. Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 160–61 (1982). However, at the pleading stage, where no fact or expert discovery has occurred, courts are "unable to conduct this rigorous analysis." *Keech v. Sanimax USA, LLC*, No. 18-cv-0683, 2019 WL 79005, at *2 (D. Minn. Jan. 2, 2019).

Consequently, courts often reserve issues related to class certification for later in the case when courts have "'sufficient material . . . to determine the nature of the allegations, and rule on compliance with [Rule 23's] requirements . . . .'" *Samaha v. City of Minneapolis*, 525 F. Supp. 3d 933, 943 (D. Minn. 2021) (quoting *Walker v. World Tire Corp.*, 563 F.2d 918, 921 (8th Cir. 1977)); see also *Legacy Gymnastics, LLC v. Arch Ins. Co.*, No. 2:20-cv-4214, 2021 WL 2371503, at *3 (W.D. Mo. June 9, 2021) (finding that arguments raised in a motion to strike "would be better addressed at the class certification stage after discovery yields more information" and that "[m]ost district courts [that] encounter motions to strike class allegations before discovery reach the same result."). Courts grant such motions only if it would be "impossible for [p]laintiffs to offer a class-wide theory of resolution." *Triple S Farms LLC v. DeLaval Inc.*, No. 22-cv-1924, 2023 WL 2333410, at *5 (D. Minn. Mar. 2, 2023); *see also Frasco v. Flo Health, Inc.*, 349 F.R.D. 557 (N.D. Cal. 2025) (certifying class of medical app users alleging privacy violations).

A "fail-safe" class, which Sanford incorrectly asserts is present in the proposed definitions, is one in which the proposed class members would either win their claim or be excluded from the class (and, thus, not bound by an adverse judgment). *Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 624 (8th Cir. 2021). As the United States Court of Appeals for the Eighth Circuit has stated, the problem with these classes is that "membership depends upon having a valid claim on the merits." *Id.*

Sanford takes issue with the proposed definitions because the definitions purportedly contain contested elements of liability. Def. Mem. at 30. But this does not make the proposed definitions fail-safe. For each of Plaintiff's claims a class member would need to prove additional elements in order to prevail on the merits. To put it another way: a person could be a member of the class and still lose. That is a permissible class definition. For example, Plaintiff would need to prove the following: a reasonable expectation of privacy (Count I, Invasion of Privacy); the inapplicability of the Party Defense under the ECPA's Crime-Tort Exception or the "use" provision (Count II, ECPA); whether Sanford's conduct was unfair (Count III, MDTPA); whether Sensitive Information is a "health record" (Count IV, MHRA); whether Plaintiff was deceived by Sanford's misrepresentations (Count V, MCFA); and whether Sanford received a benefit from its use of Plaintiff's Sensitive Information (Count VI, Unjust Enrichment). *See Soular v. N. Tier Energy LP*, No. 15-CV-556 SRN/LIB, 2015 WL 5024786, *8-9 (D. Minn. Aug. 25, 2015) (denying motion to strike class definition because an additional element of liability needed to be proved beyond the class definition). The motion should be denied because the proposed classes are not fail-safe.

Even if the proposed definitions are "fail-safe" classes, striking the class definition is a blunt approach to a problem that requires precision. Other courts in this District have rejected motions to strike class allegations, recognizing that "a more appropriate remedy for curing [an improper] class definition" is to "require Plaintiff to amend the definition at the class certification stage." *Soular*, 2015 WL 5024786, at *9; *Chen v. Target Corp.*, No. CV 21-1247 (DWF/DTS), 2022 WL 1597417, *18 (D. Minn. May 19, 2022); *see also Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012) (denying motion to strike class allegations based on improperly pleaded class because defining a class "is more of an art than a science," and problems in the class definition "should be solved by refining the class definition rather than by flatly denying class certification on that basis".).

For these reasons, the Court should deny Sanford's motion to strike the class definitions.

## CONCLUSION

For all the reasons stated herein, Plaintiff respectfully requests that the Court deny Defendant's motion in its entirety.

Respectfully submitted,

Dated: October 28, 2025

*<u>/s/ Rachel K. Tack</u>*

Brian C. Gudmundson (MN Bar No. 0336695)
Rachel K. Tack (MN Bar No. 0399529)
Madison M. DeMaris (MN Bar No. 0403467)
**ZIMMERMAN REED LLP**
1100 IDS Center
80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 3410-0400

brian.gudmundson@zimmreed.com
rachel.tack@zimmreed.com
madison.demaris@zimmreed.com

***Attorneys for Plaintiffs***