**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Robert Hanson, on behalf of himself and all others similarly situated,

Plaintiff,

vs.

Sanford Health Corp.,

Defendant.

Case No. 25-cv-3129-PJS-LIB

**Sanford Health's Reply Memorandum in Support of Motion to Dismiss**

---

## Argument

### I. The Invasion of Privacy Claim Fails as a Matter of Law.

Plaintiff's visit to Sanford's public website was not an intrusion under the law, which requires an "affirmative act by the defendant in obtaining the information" and cannot exist when the information is provided by the plaintiff, even if a defendant later shares the information. *Lehman v. Zumbrota-Mazeppa Pub. Schs.*, No. 04-1226, 2005 WL 894756, at *4 (Minn. App. Apr. 19, 2005). Plaintiff voluntarily engaged with Sanford's website and typed in a physician's name. Sanford could not have intruded in Plaintiff's private affairs. (*See* Doc. 14, p. 8 (collection of cases)).

Plaintiff argues that Sanford's alleged recording of his website visit alone constitutes an invasion of privacy. But Plaintiff's arguments contradict his position. He argues that Sanford "was recording **and disseminating** his sensitive information to third parties like Meta, Google, Microsoft, and others," (Doc. 21, p. 7 (emphasis added)); that "his privacy was also violated when Sanford intentionally **exposed** his private information to the Tracking Tools it installed on its website," (*Id.*, p. 7-8 (emphasis added)); and that he expected "Sanford would not share it." (*Id.*, p. 8). In his own words, Plaintiff complains of the dissemination of data, not its interception by Sanford. The only plausible conclusion is that the alleged harmful intrusion was accomplished by third parties, not Sanford. *See Thomas v. Pearl*, 998 F.2d 447, 452 (7th Cir. 1993) ("a plaintiff fails to state a claim for invaded seclusion if the harm flows from publication rather than intrusion").

Plaintiff also cannot establish that the alleged intrusion was highly offensive. To determine whether an interference is offensive, courts consider: "the degree of intrusion, the

context, conduct and circumstances surrounding the intrusion as well as the intruder's motives and objectives, the setting into which he intrudes, and the expectations of those whose privacy is invaded," and "the number and frequency of the intrusive contacts." *Bauer v. Ford Motor Credit Co.*, 149 F.Supp.2d 1106, 1109 (D. Minn. 2001). The interference must be a "substantial one, of a kind that would be highly offensive to the ordinary reasonable person, as the result of conduct to which the reasonable person would strongly object." *Mallak v. Aitkin Cnty.*, 9 F. Supp. 3d 1046, 1064 (D. Minn. 2014).

Plaintiff cites *In re Grp. Health Plan Litig.* ("*Group Health*") to argue that viewing a doctor profile on a public website is highly offensive.[1] But in *Group Health*, the Plaintiffs alleged that the defendant tracked them scheduling appointments, discussing medical diagnoses, and reviewing medical bills, among other allegations, over a period of time. 709 F. Supp. 3d 707, 713-14 (D. Minn. 2023). Here, Plaintiff complains about a single visit to Sanford's public Find-a-Doctor webpage. Such allegations do not rise to the level of "highly offensive."

## II. Plaintiff's Use of Sanford's Public Website Did Not Create an MHRA Claim.

Plaintiff contends that he has sufficiently pleaded a claim under the MHRA because he was a Sanford patient and typed in his doctor's name on its public website. (Doc. 21, p. 10). He again relies upon *Group Health*, but omits important distinctions between his circumstances and that case. The *Group Health* plaintiffs alleged that the website tracked interactions that scheduled appointments and procedures; received and discussed medical diagnoses and treatment from healthcare providers; received lab results; reviewed medical records; reviewed

[1] Plaintiff also cites *Kennedy v. City of Braham*, 67 F. Supp. 3d 1020, 1035 (D. Minn. 2014), which involved a claim under the Driver's Privacy Protection Act. *Id.* Plaintiff does not allege Sanford violated this Act.

medical bills; and searched symptoms and medical conditions relating to personal medical treatment. *Group Health,* 709 F. Supp. 3d at 713-14. The court concluded that such information was sufficient to plead that health records were released. *Id.* Here, there are no allegations that Sanford tracked the scheduling of appointments, reviews or discussions of medical diagnoses, or medical records or bills. *Group Health* emphasizes why Plaintiff cannot plead an MHRA claim.

Plaintiff also argues that *Okash v. Essentia Health,* No. CV 23-482 (JRT/LIB), 2025 WL 642913, at *6 (D. Minn. Feb. 27, 2025) ("*Okash II*") supports his position. But the plaintiff in *Okash II* alleged that the website tracked searches to determine whether specific providers accepted their insurance as well as searches about specific medical conditions. Plaintiff does not allege that he searched for insurance coverage or about specific medical conditions.

The recent decision in *Hartley v. Univ. of Chicago Med. Cen.*, No 22-CV-5891, 2025 WL 2802317 (N.D. Ill. Oct. 1, 2025) is instructive. There, the plaintiff claimed that the University of Chicago Medical Center ("UCMC") violated the Electronic Communications Privacy Act ("ECPA") by using a Pixel to intercept identifiable healthcare information to share with third parties. The plaintiff alleged that she used UCMC's public website to find a primary care physician and that she logged into the MyChart patient portal. *Id.* at *2. In ruling on a motion to dismiss, the court distinguished between browsing on a hospital's public website and actions within a patient portal like MyChart. *Id.* at *3-6. The *Hartley* court rejected the plaintiff's argument that UCMC disclosed individually identifiable health information by divulging her visit to UCMC's "find-a-physician" webpage when she used it to search for a primary care physician and by sharing information about "the webpages she clicked and viewed related to

her medical providers, conditions, and treatments." *Id.* at *6. The court concluded that "**[m]erely browsing and searching UCMC's website does not convey individually identifiable health information**." *Id.* (emphasis added). This is because what matters is whether the information "provides a window into an individual's personal medical history." *Id.* at n.2. Information that is available on publicly accessible websites "stands in stark contrast to the personally identifiable patient records and medical histories protected by [HIPAA]—information that unequivocally provides a window into an individual's personal medical history." *Smith v. Facebook, Inc.*, 745 Fed. App'x 8, 9 (9th Cir. 2018).

Unlike the plaintiff in *Hartley*, Plaintiff does not allege that he logged into the Sanford patient portal or even visited that page. He simply typed a doctor's name into a public search page of the Sanford website. The fact that a patient, prospective patient, or anyone else has visited a webpage is not used to make medical decisions and is not used to direct care in any way. Browsing data (outside of the patient portal) is not collected in anticipation of care, and does not relate in any way to the care a patient might receive at Sanford. Plaintiff's allegations that he viewed a provider's biography on a public website did not reveal details about the provision of healthcare, his individual health status, or medical history. *See Hartley*, 2025 WL 2802317 at *6-7; *see also Smith*, 745 Fed. App'x at 9. Plaintiff did not plead a violation of the MHRA.

## III. Plaintiff's ECPA Claim also Fails.

Plaintiff's ECPA argument is equally unavailing. First, Plaintiff argues that discovery is required before dismissal of his ECPA claim, but his authority does not support such a proposition. *See Mekhail v. N. Mem'l Health Care*, 726 F. Supp. 3d 916 (D. Minn. 2024). The

*Mekhail* court concluded that the plaintiff had sufficiently pleaded that North Memorial had the purpose of violating the law—there was no blanket holding that discovery is necessary to determine an ECPA claim at the motion to dismiss stage. *Id.*

Next, Plaintiff argues that the party exception of the ECPA does not apply based on *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) ("*Facebook Tracking*"). Plaintiff concedes that the "only difference" between *Facebook Tracking* and the present action is that "Sanford intercepted and procured Meta … to intercept, which creates the same liability under the ECPA." (Doc. 21, p. 17). Plaintiff does not provide a citation for this assertion, likely because there is no support for it. In fact, the difference between Meta and Sanford in this context is crucial. In *Facebook Tracking* the plaintiffs alleged that Meta had intercepted communications of their users interacting with third-party websites and sent URL information to Facebook even after the user had logged out of their Facebook account. *Id.* at 596. In other words, Facebook installed a tracker on their users that collected their interactions with third-party websites even after they had stopped using Facebook. The court reasoned that Facebook was not an intended party to their users' interactions with third-party websites once the user had logged out of the application. *Id.* at 607-08.

This action is different. Plaintiff complains about a single website interaction on Sanford's website—not that Sanford tracked his actions on third-party websites. Plaintiff admits that Sanford was an intended party to his communication. (See Doc. 1, ¶ 175). As discussed in Sanford's principal brief, Meta, not Sanford, intercepted the communication at issue. Plaintiff's reliance on *Facebook Tracking* is misplaced.

Plaintiff next argues that the crime-tort exception to the ECPA applies. (Doc. 21, pp. 20-21). He primarily argues that he alleged a wide variety of issues with HIPAA. But Plaintiff ignores the fact that nearly every court has concluded that an ECPA claim fails where the tort is to generate revenue without ill intent. (*See* Doc. 14, pp. 21-22 n.7 (collecting cases)). In cases where an ECPA claim has advanced, the plaintiff alleged the monetization of private health data tracked from a private patient portal. *See Mekhail*, 726 F. Supp. 3d at 928. No such allegation exists here. Plaintiff cannot succeed on an ECPA claim where he failed to allege that Sanford committed an independent tortious or criminal act. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 797 (N.D. Cal. 2022); *Kurowski v. Rush Sys. for Health* (*Kurowski II*), No. 22-5380, 2023 WL 4707184, at *4 (N.D. Ill. July 24, 2023); *Okash v. Essentia Health* ("*Okash I*"), No. CV 23-482 (JRT/LIB), 2024 WL 1285779, at *4 (D. Minn. Mar. 26, 2024).

That Sanford was a party to the communication dooms Plaintiff's ECPA claim. Even accepting Plaintiff's allegation that HIPAA regulations required his authorization, lack of authorization does not change the fact that Sanford, a party to the communication, consented to its interception. *Okash I*, 2024 WL 1285779, at *4. Further, Plaintiff cannot succeed on his ECPA claim because he has not alleged an independent act aside from the alleged interception.

**IV. Plaintiff has not Pleaded a Viable MDTPA Claim.**

Plaintiff's primary response to Sanford's motion to dismiss the MDTPA claim is that he sufficiently pleaded a future risk of harm and facts that concern the "who, what, when, where and how" of the allegedly deceptive conduct. *See E-Shops Corp. v. U.S. Bank Nat'l Ass'n,* 678 F.3d 659, 665-66 (8th Cir. 2012). Plaintiff contends that he pleaded the "when" by stating his website visit occurred in "fall 2024." Plaintiff cites *Group Health* to argue that providing the

year is sufficient. (Doc. 21, p. 35). But the plaintiff there stated "nine specific dates" that HealthPartners had transmitted communications. 709 F. Supp. 3d at 721. Here, Plaintiff does not state when he visited the website, when he received targeted advertising, what information he viewed on the website, and what advertisements he saw. (Doc. 1, ¶¶ 15, 16). Because these vague allegations fall short of the particularity required by Rule 9, Count III should be dismissed.

## V. Plaintiff has not Pleaded the Causal Nexus Required for an MCFA Claim.

Plaintiff's argument about his MCFA claim sidesteps the requirement to plead a causal nexus. *See Mekhail*, 726 F. Supp. 3d at 928-29. Plaintiff implies that because Sanford is a medical provider and some people visit the website to seek medical care, a higher level of confidentiality is required under the patient-provider relationship. (Doc. 21, pp. 30-31). But there is no logical path to contend that any website visitor creates a patient-provider relationship—especially where the visit only involved the public-facing website. Unsurprisingly, Plaintiff does not provide any authority that applies a heightened level of confidentiality to healthcare providers' public websites. In fact, nearly every lawsuit concerning this topic that survives the motion-to-dismiss stage includes tracking information related to a private portal, where a patient-provider relationship inherently exists.

Plaintiff needed to plead "a causal relationship between the alleged injury and the wrongful conduct that violates the statute." *Graphic Commc'ns Local 1B Health & Welfare Fund "A" v. CVS Caremark Corp.*, 850 N.W.2d 682, 693 (Minn. 2014). Plaintiff did not plead a correlation between his visit to the Find-a-Doctor page and his receipt of an advertisement that he cannot even recall. Plaintiff does not allege that he was targeted with advertisements

selling Sanford's services. And he does not allege that he received advertisements about the doctor that he viewed. Plaintiff did not allege the required "nexus between the alleged fraud" and the "services" Sanford sold to him. *Mekhail*, 726 F. Supp. 3d at 928-29. The Court should dismiss Count V of Plaintiff's Complaint.

## VI. The Court Should Strike the Fail-Safe Class Definition.

Plaintiff's primary response to Sanford's motion to strike his class definitions is that it is premature. (Doc. 21, pp. 31-32). Sanford recognizes that striking a class definition is disfavored, but the Eighth Circuit has unequivocally held that "a district court may grant a motion to strike class action allegations prior to the filing of a motion for class-action certification." *Donelson v. Ameriprise Fin. Services, Inc.*, 999 F.3d 1080, 1092 (8th Cir. 2021). Thus, it is not premature to consider Sanford's motion to strike Plaintiff's class definitions where they are "fail-safe" and "allow putative class members to seek a remedy but not be bound by an adverse judgment." *Orduno v. Pietrzak*, 932 F.3d 710, 716 (8th Cir. 2019).

Plaintiff next argues that his class definitions are not fail-safe because a class member would need to prove additional elements beyond the class definitions to prevail on the merits. (Doc. 21, p. 33.) But even incorporating one contested element of liability in the class definition is problematic. *See Ford v. TD Ameritrade Holding Corp.*, 995 F.3d 616, 624 (8th Cir. 2021) (reversing class certification because class definition included two contested elements of liability). For example, if a class definition includes even one contested element of liability, a potential class member would be excluded from the class if they could not show that element of liability. As a result, they would be able to seek a remedy but not be bound by an adverse judgment—the very problem present in fail-safe classes. *See Pietrzak*, 932 F.3d at 716. Here,

Plaintiff's proposed class definitions contain at least three contested elements of liability and are, therefore, fail-safe. (Doc. 14, p. 40); *see Thompson v. Vintage Stock, Inc.*, 4:23-CV-00042-SRC, 2024 WL 492052, at *10 (E.D. Mo. Feb. 8, 2024), *reconsidered and partially remanded on other grounds*, ("This supports that including consent as part of the class definition would make it a fail-safe class because if the answer is "no" for a certain class member, that member would not be bound by an adverse judgment." (cleaned up)). Plaintiff's class definitions are fail-safe and should be stricken.

## Conclusion

Plaintiff has not plausibly alleged that his act of typing a physician's name into a public website resulted in a disclosure of his individually identifiable healthcare information. Sanford respectfully requests the Court grant its motion to dismiss.

Dated: November 11, 2025

**Larson · King LLP**

By *s/ Shawn M. Raiter*
Shawn M. Raiter (0240424)
Zane P. Aubert (0402523)
Alex Baker Kroeger (0400604)
Matthew B. Bolt (0403468)
2800 Wells Fargo Place
30 East Seventh Street
St. Paul, MN 55101
(651) 312-6500
sraiter@larsonking.com
zaubert@larsonking.com
akroeger@larsonking.com
mbolt@larsonking.com

**Attorneys for Defendant Sanford Health**